UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                                             :
EARL DAVIS,                                                  :
                                          Plaintiff,         :
                                                             :
                  -against-                                  :
                                                             :
JOSEPH P. CARROLL and                                        :
JOSEPH P. CARROLL LIMITED,                                   :
                                         Defendants.         :
                                                             :          09 Civ. 1088 (JPO)
------------------------------------------------------------ X
                                                             :          MEMORANDUM
JOSEPH P. CARROLL and                                        :          AND ORDER
JOSEPH P. CARROLL LIMITED,                                   :
                              Counterclaim Plaintiffs,       :
                                                             :
                  -against-                                  :
                                                             :
EARL DAVIS,                                                  :
                              Counterclaim Defendant.        :
                                                             :
------------------------------------------------------------ X
```

J. PAUL OETKEN, District Judge:

This case arises from scandal in the elite world of New York's fine art galleries. Plaintiff

Earl Davis entrusted artworks produced by his father, the influential American modernist painter

Stuart Davis, to Salander O'Reilly Galleries ("SOG"). Unbeknownst to Davis, SOG was caught

in a vast web of unethical and illegal dealings that ultimately resulted in a criminal conviction.

Before SOG's house of cards collapsed, its principal, Lawrence Salander, engaged in a series of

major transactions with Defendant Joseph P. Carroll. Over four months in 2006, Salander

purported to sell 44 artworks to Carroll—including eight Stuart Davis works, which are at the

heart of this dispute. Davis has sued to recover those works. He argues that Carroll should have

1

been alerted to signs of foul play and that Carroll's due diligence reflected the very sort of commercial indifference to legal rights that New York law refuses to tolerate.  Carroll retorts that he had every reason to trust SOG and that his due diligence was more than adequate.

Davis has moved for summary judgment.  He has also moved to strike Carroll's art industry expert and to sanction Carroll for spoliation or perjury.  For the reasons that follow, Davis's motion for summary judgment is granted, his motion for sanctions is denied, and his motion to strike is granted in part and denied in part.

## I.       Background[1]

Jurisdiction of this action is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).  Plaintiff is a citizen of New Jersey and Defendants are citizens of New York.  The amount in controversy exceeds $75,000.

### A.       The Parties

Plaintiff Earl Davis is the only son of Stuart Davis (1896-1964), one of America's most celebrated modernist artists.  Davis is the owner, through gifts received from his parents, of a large number of Stuart Davis paintings, works on paper, drawings, and sketches.  Many of these works have not previously been sold.  During the time period relevant to this case, Davis occasionally signed agreements on behalf of, and identified himself on provenance statements as, the "Estate of Stuart Davis."[2]

Defendant Joseph P. Carroll is an international museum curator, philanthropist, and private art dealer.  He has been in the business of buying art for resale for nearly 35 years and

---

[1] The facts are undisputed unless otherwise noted.  This background section reflects the Court's rulings on Davis's motions to strike and sanction, discussed below.

[2] Unless clarity dictates otherwise, Davis and the Estate of Stuart Davis will be referred to collectively in this opinion as "Davis."

includes American modernism among his areas of focus. Carroll purchased, sold, and consigned artworks from, to, and through New York art galleries during the 1990s and 2000s. Defendant Joseph P. Carroll Limited is a corporation formed under New York law. It is a legal entity through which Carroll conducted business for over twenty years; Carroll is its president and sole stockholder. Carroll Limited has been essentially dormant since 2010.[3] From 1990 to 2000, Carroll purchased over 1,000 works of art.

Lawrence Salander (a non-party) was the principal of Salander-O'Reilly Galleries (SOG) (also a non-party), which was considered one of the preeminent art galleries in Manhattan until late 2007. In November 2007, SOG's creditors commenced an involuntary case against it under Chapter 7 of the Bankruptcy Code and Salander filed for voluntary bankruptcy. In March 2009, SOG and Salander were indicted in New York County on 100 felony counts, including multiple counts of Grand Larceny in the first degree, for a series of fraudulent schemes perpetrated against, amongst others, Davis. On March 18, 2010, Salander and SOG pleaded guilty to approximately 30 felony counts, including a count of Grand Larceny in the first degree charging that they stole property from Davis valued in excess of one million dollars.

### B. Davis's Consignment of His Stuart Davis Works to SOG

Stuart Davis died in 1964. His wife, Roselle Davis, died in 1994. During their lives, they gifted to their son, Earl Davis, many Stuart Davis works, including the works at issue in this case (collectively "the Eight Disputed Works"). In the late 1970s or early 1980s, Davis met Salander at a Christie's auction. Soon after, in response to an open invitation from Salander, Davis

---

[3] Unless clarity dictates otherwise, Carroll and Carroll Limited will be referred to collectively in this opinion as "Carroll."

proposed that they work together on a catalogue raisonné and Salander agreed.[4]  As part of this

deal, Salander undertook to bankroll the project and provide other forms of support.

In the early 1980s, Davis consigned to Salander his first Stuart Davis works.[5]  Davis

recalls that he "gradually became more comfortable with [Salander] and came to trust him

increasingly."  By around 1987, Davis had consigned a number of works for display at shows

and possible sale.  Davis and Salander agreed to four or five exhibitions over the course of the

1980s; each time, Davis generally took back most of the works that did not sell.  In this stage of

their relationship, Salander sold Stuart Davis works that Davis provided to him for exhibitions

and that Davis left on inventory for sale.

In December of 1990, Davis and Salander signed an agreement providing that SOG

would be the worldwide representative of the work of Stuart Davis for five years.  At the end of

this contract, Davis and Salander "had an ongoing oral understanding" that lasted through late

2007.  Throughout this period, Davis was denoted in some of these agreements as "The Estate of

Stuart Davis" because he owned a majority of his father's works.  Ultimately, from the mid-

1980s through 2007, Davis consigned the majority of the Stuart Davis artworks that he owned to

SOG.  At times, more than fifty of his Stuart Davis artworks were consigned to SOG.

Throughout this period, the terms of Davis's oral deal with SOG included an

understanding that the gallery would contact him for an updated pricing before selling any art

---

[4] A "catalogue raisonné" is a definitive catalogue of a painter's life work.  *See* New York Public Library, *What is a Catalogue Raisonné?,* http://www.nypl.org/locations/tid/36/node/29583 (defining a "catalogue raisonné" as "a comprehensive, annotated listing of all the known works of an artist either in a particular medium or all media").

[5] A work is held on consignment when it is sent to an agent for sale, with title being held by the consignor until a sale is made.  Agreements between consignor and agent often include terms that govern the relationship and define the agent's authority to exhibit or sell the works.

work or indicating an asking price.  Thus, the gallery would regularly contact him, inquire about

his asking price for a particular work that he had consigned, and then later inform him whether it

was sold at or above that price or did not sell at all.  In 2003, Davis discovered that SOG had

sold one of his consigned works—*Drawing on Canvas for Punchcard Flutter*—without

informing him.  Davis later learned that SOG had, in fact, been "doing it all the time."  But as of

late 2005 and early 2006, Davis did not know of this practice by SOG.  Davis did not file any

U.C.C. financing statements to publicize his consignment interest in works delivered to SOG.

### C.   Carroll's Acquisition of the Eight Disputed Works

#### 1.   Events Leading Up to the 2006 Exchanges

Carroll first met Salander in 1991 and completed his first art transaction with Salander in

1998.  Between January 1998 and December 2005, Carroll and SOG engaged in a number of art

transactions.  Carroll estimates that, in total, Carroll Limited purchased approximately 120 works

of art from Salander or SOG and sold approximately 40 works of art to SOG.  He adds that

"almost all of Carroll Limited's purchases from SOG between 1998 and 2007 involved groups of

art exchanged for both art and money."  One such deal, which was finalized on January 26, 1998,

involved Carroll exchanging 33 artworks—three watercolor/crayon works, 17 Middletown

watercolors, and 13 drawings—for three paintings owned by SOG.

In 2000 and 2001, Carroll purchased five Stuart Davis works from SOG.  Carroll states

that, at the time, he believed that SOG owned these works.  He explains that the provenance

statements "indicated that the works had been transferred from 'The artist; to present owner,'

which [Carroll] understood to be SOG."  When asked about these transactions in his deposition,

however, Carroll stated that "[SOG] at this point represented the estate.  Whether [the art] was

owned by the estate or owned by [SOG], I don't know."

Davis disputes these statements by Carroll and argues that Carroll knew in 2000-2001 that the Stuart Davis works he purchased from SOG were owned by Davis or by the Davis Estate, and not by SOG.  Davis notes that some of the documentation produced as part of the 2000-2001 deal listed "Estate of the Artist" as the provenance, not "to present owner."  Further, whereas works that Carroll sold to SOG were listed as "owned by" Carroll, the Davis Works were listed as "sold by" SOG.  In subsequent documents related to these works, Carroll cited publications that listed Earl Davis as their owner and, when Carroll resold two of these works in June 2002, he prepared documents listing the provenance as "The artist and his estate, 1916-2000/(Sold through [SOG]/The Honorable Joseph Carroll New York 2000-)."

Separate and apart from the question of ownership of the works exchanged in 2000-2001, Carroll knew in 2000 and remained aware in the fall of 2005 that SOG represented the Davis Estate.  The relationship between Davis and SOG was common knowledge in the art world.

In these and other transactions, Carroll created his own documentation and did not rely exclusively on the documentation provided by SOG.  Whereas Davis describes this habit as evidence that Carroll distrusted the quality and accuracy of SOG's documentation, Carroll describes it as part of his standard practice designed to secure certain legal rights and to account for the apparent absence of "centralized protocol" at SOG for generating documentation.

Davis and Carroll sharply dispute the course of events involved in a transaction between Carroll and SOG in late 2005 that, in Davis's view, put Carroll on notice that SOG was dealing in fakes and was short on cash.

As Carroll recalls this course of events, on September 28, 2005, he entered into a fixed price consignment/purchase agreement with SOG, whereby Carroll consigned two paintings to SOG for a fixed net price of $525,000.  Specifically, Carroll consigned Marsden Hartley's *Still*

6

*Life: Leathery Leaves* and Albert Pinkham Ryder's *Homeward at Twilight*.  On October 19, 2006, Carroll Limited filed a U.C.C. financing statement publicizing its interest in both works and its consignment of them to SOG.  Under the terms of this deal, SOG had the option either to return the two works on December 28, 2005, or to purchase both works outright for a combined $525,000, payable in two installments—the first of which would be $175,000 due on December 28, 2005.  Then, in early December 2005, Carroll contacted Deborah Rothschild of the Williams College Museum of Art to discuss inclusion of Gerald Murphy's *Yellow Rose* in an exhibition. Carroll had acquired *Yellow Rose* from Salander in 2003 at a nominal value of $125,000. Rothschild informed Carroll that, in her view, *Yellow Leaves* had been painted by Murphy's wife—an opinion that, even if not widely accepted, could substantially decrease the work's value.  Carroll brought the matter to Salander, who vehemently disagreed with Rothschild's accusation.  Nonetheless, as an accommodation to the potential loss of value, Salander allowed Carroll to exchange *Yellow Rose* for a merchandise credit of $150,000.  As part of this exchange, Carroll extended SOG's consignment/purchase option for *Leathery Leaves* and *Homeward at Twilight* to January 25, 2006, though if SOG exercised its purchase option the *full* payment amount would be due on the date of purchase (January 25, 2006).  Salander exercised his purchase option and finalized the deal on January 24, 2006.  Carroll affirms that he "subscribed, and continue[s] to subscribe to Ms. Rothschild's opinion that the issue was a simple case of honest misattribution by the Gerald Murphy Estate, which SOG and Salander represented."  He saw nothing unusual about his arrangement with Salander and, in his own words, "would not have risked [his] capital in dealing with Salander and SOG if [he] had any indication that they were engaged in any questionable activities or experiencing any financial difficulties."

7

Davis disputes this characterization of these events.  He argues that the purported Murphy painting was "obviously" a fake, that SOG was suspected of dealing in fakes in early 2006, and that SOG's inability to make a December 28, 2005 payment on the consignment/purchase agreement put Carroll on notice of SOG's shaky financial situation.

On November 30 and December 1, 2005, two Stuart Davis works sold for record amounts at Christie's and Sotheby's ($4.5 million and $3.152 million, respectively).  In response, Davis called Salander to put a freeze on all sales pending a reevaluation of all list prices, but Salander did not answer Davis's calls for several days.  Salander thereafter called Davis to report a sale of four Stuart Davis artworks, even though their arrangement provided that Davis would provide final approval for any such sales.  Davis was furious.  Ultimately, Davis "told [Salander] to suspend all sales pending his return of the works to me before we had any further discussion between him and me."  Salander agreed to suspend sales and return Davis's artworks.  He also agreed to Davis's demand for payment.  Starting in January 2006 and continuing through the next two years, Davis regularly and aggressively pressured Salander to return all of the works that Davis had placed on consignment.  Salander kept promising to do so, but always found an excuse to delay.

### 2.    The 2006 Transactions

As of December 2005, Carroll still had $150,000 in merchandise credit at SOG as a result of the *Yellow Rose* incident.  In early January, Carroll visited the gallery and browsed several floors worth of art.  Carroll did not consult the price list, but did condition his stated interest in certain works on their price.  Around this time, Salander expressed to Carroll his desire to pull out of the modernist area and focus on old masters, adding that "We'll have an end of year 90

percent off sale." Carroll describes this statement as a joke and notes that "we both laughed." Davis views it as a red flag that Salander was dumping works at bargain basement prices.

Carroll returned on January 6, 2006 and commenced a series of overlapping transactions that ultimately were finalized in a single "Summary Exchange Agreement" on May 22, 2006. In these exchanges, Carroll and SOG cross-exchanged cash and numerous artworks. Carroll's primary interest was to acquire Stuart Davis artworks; he recalls thinking that "I am doing this transaction because of the Davises." The 2006 Exchanges were memorialized in a series of "Exchange Agreements" prepared by Carroll. SOG sold 44 artworks by 12 artists to Carroll, including 16 Stuart Davis works. The parties have focused on 15 of those Stuart Davis works ("the Fifteen Davis Works"), though Davis seeks only the return of (or damages for) eight of those works ("the Eight Disputed Works"). In the 2006 Exchanges, SOG's asking price for the 44 works was $2,590,000 and its asking price for the Fifteen Davis Works was $1,445,000. SOG also gave Carroll $300,000 in cash. In exchange, Carroll gave SOG five artworks, a photograph, and $1,715,000 cash.

Carroll reports that the general price and exhibition histories of these works were well known to members of the American art dealing community. He states that in his negotiations with Salander, for each work Carroll either proposed a blanket 40-percent discount off SOG's December 2005 Miami-Basel published list prices or asked Salander "what he wanted." There were no negotiations over individual asking prices, but Carroll was free to accept or reject any individual artwork as part of the overall negotiation in creating these cross-exchanges. Deals on works and prices were struck quickly during these negotiations; Carroll recalls that he was "typically able to decide within minutes which artworks [he] was willing to purchase."

The executed agreements, including the Summary Exchange Agreement, did not set forth prices for the individual artworks.  Carroll, however, prepared separate documents that contained the individual prices agreed to by Carroll and Salander.  In his declaration, Carroll characterizes these listed prices as "SOG's offering prices . . . for each separate work" that he maintained as a guide for their future pricing.  In his deposition, however, Carroll repeatedly described these notations as the actual, agreed-upon purchase prices.  He stated that "[w]hat I would do is write down the name and write down the price that we agreed on," that these documents "give[] the breakdown on the pricing of the individual items which I did buy," and that "what I do have are the transcribed documents, which is what the price is."[6]

Carroll explains that, throughout these transactions, he believed (and was justified in believing) that SOG owned the Stuart Davis works or had authority to sell them.  This confidence, in Carroll's view, was justified by two undisputed facts.  The first is that it was well known in the art industry at the time that SOG was the exclusive representative for Stuart Davis works and that SOG maintained a well-established relationship with Davis.  The second is that, prior to 2007, Salander enjoyed a golden reputation in the art business.  Salander was particularly well known for his influence in the market for American Modernist artworks and had recently moved his gallery to a multi-million dollar mansion in Manhattan's Upper East Side.  Multiple news reports and profiles confirmed Salander's status as a giant of the field.

The 2006 Exchanges occurred in two waves: one in January and February, the other in April and May.  Davis argues that certain documentation produced during these transactions, as well as certain other events, reveal that Carroll was on notice of foul play at SOG.

---

[6] In Plaintiff's Rule 56.1 Statement at ¶32, Plaintiff cites many other portions of the Carroll Deposition in which Carroll confirmed that his documentation reflected the agreed upon prices, not merely offering prices.

### a.      January and February 2006

Carroll and SOG undertook four exchange agreements in January and February 2006. These exchanges are summarized in an "Exchange Agreement" dated February 10, 2006, and covered eighteen artworks by ten artists (including five Stuart Davis works, only four of which are at issue in this case).

In the documents produced by Carroll and Salander in connection with these agreements—dated January 6, January 11, January 24, and February 10—the works transferred from SOG to Carroll are all described as "*owned by* Salander-O'Reilly Galleries" (emphasis added). Separate from this statement of ownership, Carroll received no documentation confirming that SOG owned the Davis works, Salander never told Carroll that SOG owned the Davis works, and Carroll never asked Salander whether SOG owned any of the disputed Davis works. The provenance statements provided by SOG to Carroll for the four Davis Works included in the January/February exchanges all listed "Estate of the Artist" as the operative provenance. In contrast, Carroll received provenance statements for three non-Davis works purchased from SOG in these exchanges that *did* identify SOG as the current or prior owner, as well as a provenance statement for a fourth work that identified Salander and Salander's wife as the owners.

Carroll explained that he "assumed that the owner was actually probably, you know – actually, I assumed that the owner was probably – to the – was probably Salander." This assumption, he added, rested on the fact that Salander had announced his desire to clear out American Modernist works and the fact that Salander could easily have returned to their owners any artworks held on consignment. Since it would have been so easy to clear out works on consignment, and Carroll knew that SOG maintained works on consignment from Davis, Carroll

11

thought Salander owned the Stuart Davis works exchanged in January and February 2006. Carroll did not inquire of Salander at this time whether SOG owned the works or held them on consignment.

### b.      Developments from February 10, 2006 to April 14, 2006

On April 10, 2006, Carroll spoke with John Driscoll of Babcock Galleries while preparing to consign to Driscoll a group of works acquired from Salander.  Carroll describes Driscoll as "a leading figure in the American art field."  Driscoll informed Carroll that SOG Director Leigh Morse had "told [Driscoll] that the work that [Carroll] had didn't come from the estate but, rather, came from Earl Davis personally."  Carroll understood Driscoll to be saying that the works that he (Carroll) had purchased from SOG were from Davis's personal collection.

Carroll then raised the issue of ownership with an SOG employee named Erin Fitzpatrick. Carroll states in his declaration that "Mr. Fitzpatrick advised me that the provenance statements SOG provided at the time of Carroll Limited's purchases were correct, that the five Stuart Davis works I had purchased from SOG in January-February 2006 had come from the 'Estate of the Artist,' and that he understood that the 'Estate' *was* Davis." Carroll reports that he saw no cause for concern regarding SOG's propriety in this fact because it was "widely publicized that SOG was the exclusive representative of the Estate of Stuart Davis."  Carroll adds:

> However, I did not understand how an individual and an "Estate" could be one and the same, and I noted that a distinction was made in the literature I had seen between the "Estate of Stuart Davis" and Davis.  I therefore decided to follow Dr. Driscoll's suggestion to modify the provenance statements in my own cataloguing of my SOG Davis purchases to:
>
> *The artist and his Estate; to George Earl Davis, his son; to The Honorable and Mrs. Joseph P. Carroll, New York, New York (Acquired directly from the*

12

> *above through Salander-O'Reilly Galleries LLC,*
> *New York, New York)*

and to submit this revised cataloguing to the Stuart Davis Catalogue Raisonné Committee for verification.

According to his declaration, Carroll also asked Fitzpatrick to clarify whether the proper counterparty to his transactions was "Salander O'Reilly Galleries LLC," "Salander-O'Reilly Galleries, Inc.," or "Salander O'Reilly Galleries." Fitzpatrick clarified that the correct counter-party was "Salander O'Reilly Galleries LLC" and that the earlier documentation was mistaken. Carroll and SOG decided to rectify this mistake by restating the January-February transactions in a later transaction memorialized in corrected paperwork.

In his deposition, Carroll offered a slightly different account. He indicated that when he spoke to Fitzpatrick about the ownership issue raised by Driscoll, Fitzpatrick "never actually gave [him] an answer." He recalled "getting conflicted documentation" and "not getting a clear answer either from Salander or from [Fitzpatrick]." He noted that "no one is confirming them that they are from the estate or from Earl Davis. I am just being told again that they are – you know, they are selling this stuff . . . So I really don't know." Carroll did not inquire as to why SOG had prepared and then signed documentation indicating that it "owned" the Davis works.

On April 19, 2006, Carroll consigned to Babcock Galleries two of the Davis works that he had obtained from SOG in 2000-2001. Carroll included provenance statements that he prepared stating: "The artist and his Estate/George Earl Davis, his son/The Honorable Joseph P. Carroll, New York, New York, 2000-/ (Acquired directly from the above through [SOG])." Driscoll (of Babcock) explained in his deposition that "[t]he way I would read that provenance is this was acquired by Mr. Carroll from [SOG] who would have been representing the son, George Earl Davis." Driscoll added that "what Mr. Carroll is asserting on his provenance is that he

acquired the painting through [SOG], so that would be an assertion that [SOG] did not own it, and you can't list somebody in the provenance who didn't own it."  Six days later, Carroll consigned to Babcock another Davis work—*Tobacco Fields, Tioga, Pennsylvania*—which Carroll had acquired from SOG in January 2006.  In the Carroll-SOG documentation, this work was identified as "owned by [SOG]."  In the provenance prepared by Carroll for Driscoll, the work was identified as "The artist and his Estate/George Earl Davis, his son/The Honorable Joseph P. Carroll, New York, New York, 2000-/ (Acquired directly from the above through [SOG])."

### c.   April and May 2006

On April 25, 2006, Carroll acquired 15 more works from SOG, including four more Davis works.  On May 22, 2006, Carroll acquired 11 more works, including seven more Davis works.  On that same date, Carroll prepared the Summary Exchange Agreement, listing 40 artworks, including 11 Davis works, that Carroll had obtained from SOG between January and May 2006.  In this Agreement and accompanying documentation, Carroll described all the works as "sold by" SOG, even the 18 works, including four Davis works, that his own documentation had previously identified as "owned by" SOG.

On May 22, Carroll also prepared an Exchange/Buy Back Agreement in which he obtained four more Davis artworks from SOG.  Documents prepared in connection with this transaction described the Davis works as "exchanged by" SOG.

One of the Davis Works that Carroll acquired from SOG on May 22 was *Standard Brand No. 2*.  Driscoll had tried to purchase that work earlier in May 2006, but was told by Morse that Davis did not want that piece to be sold and that SOG therefore could not sell it.  Driscoll learned of the sale just a few days after May 22 and expressed to Carroll "outrage and betrayal" because

14

he "felt that [he] had been jerked around by [SOG] and possibly by Leigh Morse who I trusted, and by Earl Davis."  Driscoll indicates that he "did not fault Mr. Carroll for acquiring the picture. I felt there was fault elsewhere in having it taken away from me in the midst of a transaction." Carroll recalls that Driscoll "said to me, that [Morse] came back and said that the piece belonged to Earl Davis, that he did not want to sell it."  Carroll explains that he "thought it was just a story being given to Mr. Driscoll where basically they decided not to give him one piece but to unload other pieces which they couldn't sell because he needs it for his gallery."

None of the provenance statements for any of the Fifteen Davis Works included in the May 22 Summary Exchange Agreement—including the statements for the four Davis works restated from the January-February transactions—identified SOG or Salander as the owner. Fourteen of the fifteen Davis Works were identified in pre-2006 publications as owned by "Earl Davis" or "the Estate of the Artist."  None of the Eight Disputed Works were identified in any of these previous publications as being owned by SOG or Salander, and many of these publications were cited in the SOG provenance documents provided to Carroll and in Carroll's 2006 sale and consignment documents.  Carroll did not ask Salander when or how SOG had acquired the large number of artworks from its own clients involved in these transactions.  Nor did Carroll contact Davis to confirm his assumption that SOG owned the Fifteen Davis Works.

### d.    Pricing of the Artworks

Although the parties mostly agree on how much Carroll paid for each artwork, they heavily dispute whether these prices were so low as to constitute "bargain basement" deals.

Davis argues that the "bargain basement" prices that Carroll paid for the Stuart Davis works should have put him on notice of foul play in the 2006 Exchanges.  Davis is supported in this argument by two experts.  The first expert, Elin Lake-Ewald, employed a market comparison

approach to conduct a fair market value appraisal of each of the Davis artworks at issue in this

litigation ("the Ewald Report").  Ewald conducted her fair market value appraisal prior to the

commencement of the lawsuit and without any information about the 2006 Exchanges.  Her

appraisals reflect the value of each work in January to May 2006.  The Ewald Report notes that

"[t]here has been a strong and rising market for American Modernist work in recent years," and

that "[t]he market for work by Stuart Davis was robust in 2006."   Davis's second expert, Debra

J. Force, offers an opinion on the commercial reasonableness of the 2006 Exchanges in light of

art industry norms ("the Force Report").  She concludes that multiple red flags, including price,

should have led Carroll to conduct a more thorough inquiry:

> There are numerous examples that demonstrate that the prices at
> which Carroll obtained the Davis works were too good to be true.
> Given the significantly low sale prices, the absence of any basis to
> believe that SOG was the owner of the works, [and] Salander's
> statements that he was having a clearance sale on American
> Modernists, Carroll, who was particularly knowledgeable about the
> market value of American Modernists, including Stuart Davis, was
> obliged to obtain assurances that SOG either owned the works or
> that the owner had authorized the sales at these prices.

The Force Report identifies "[s]ome examples that show that the prices were sufficiently low to

have put Carroll on notice that the proposed Transactions were at best highly questionable,

especially given the other circumstances of the Transaction."

Carroll "vigorously dispute[s] this assertion" by Davis and Davis's experts.  He states in

his declaration that "SOG's pricing for the Eight Disputed Works was fully consistent with what

SOG had been asking for the works for several years, both at SOG and multiple other venues

where they remained unsold, establishing them as being overpriced works, stale in the

marketplace, and overpriced."  Carroll states that in his experience, "a seller's consignment price

is an asking price for sale, and does not equate to 'fair market value,'" adding that "a dealer purchasing art pays less than fair market value."

Davis's first examples of questionable pricing are *Pochade I* and *Pochade II*. These works are of equal value. Carroll states that he declined to purchase *Pochade II* at SOG in early January 2006, but changed his mind after a conversation in which Driscoll persuaded him that *Pochade II* was far more significant as an example of Stuart Davis's black-and-white works— and thus far more valuable—than SOG's cataloguing suggested. Driscoll told Carroll that he had recently purchased a Stuart Davis black-and-white work for $500,000, and that this work was now on display at Babcock Galleries with an asking price of $2 million. Carroll states in his declaration that, after his talk with Driscoll, he called Salander and offered to purchase all unsold Stuart Davis black-and-white works that SOG had exhibited at Art Basel at the same 40% discount that Driscoll had received off the price list.[7] Carroll indicates that Salander agreed and sold the *Pochades* to Carroll for $300,000 each. Carroll notes that he understood this to be the second highest recorded price for a Stuart Davis black-and-white painting and thought it was "reasonable and consistent with their prior sales and price history."

Carroll states that, as a condition of SOG's sale of *Pochade II* on "January 12, 2006," Salander requested that Carroll consign it back to SOG for an exhibition organized by Steve Harvey, an SOG employee, and that Carroll agreed to this request. The consignment agreement, dated "11 January 2006," indicates that Carroll consigned *Pochade II* back to SOG the same day that he purchased it for $300,000—before any re-cataloguing or re-identification—and that this consignment was conditioned on $750,000 minimum net to Carroll in the event of sale. Carroll

---

[7] This fact, however, is not mentioned in the several hundred pages of deposition testimony provided by Carroll about the sequence of events involved in the 2006 Exchanges.

notes that after he took delivery of the *Pochades* in April 2006, he "had them restored and [he] recatalogued them . . . completely changing their meaning and significance." He consigned them to Babcock Galleries for a price of $1.2 million.

Carroll states that he then learned that *Leathery Leaves*, one of the works that were part of his $525,000 consignment to SOG, was being exhibited by another dealer for $1.8 million. He reports that Salander informed him that he (Salander) had identified *Leathery Leaves* as a 1917 piece by Marsden Hartley, not a circa 1920-1924 piece. Carroll asserts that he struck a new deal with Salander, involving *Leathery Leaves*, in which "we both understood that the actual consideration I was giving SOG for the purchase of *Pochade II* and other works was $1,450,000 more than originally contemplated owing to the increase in consideration for *Leathery Leaves*."

Carroll indicates that on October 9, 2006, he executed an Exchange/Buy-Back Agreement with a group represented by Salander and SOG, "under which [he] exchanged two works—*Pochade II* and *Kabuki Tetrad* by John Covert[]—in exchange for [*Pirate II*] by Arshile Gorsky." He states that, "[f]or purposes of this buy-back option, the [*Kabuki Tetrad*] and *Pochade II* were each assigned a strike price of $1,250,000 and *Pirate II* was assigned a strike price of $2.5 million." Carroll adds that before the buy-back option expired, he entered into another deal with Salander under which two other Stuart Davis works—*Graveyard in the Dunes* and *Standard Brand #2*—were exchanged with SOG for *Kabuki Tetrad* plus a 30-day buy-back option. For purposes of this option, the strike prices were $175,000 for *Graveyard in the Dunes*, $225,000 for *Standard Brand #2*, and $400,000 for *Kabuki Tetrad*. Carroll does not explain why *Kabuki Tetrad* was assigned a strike value of $1.25 million in one transaction and then a strike value of $400,000 in a subsequent transaction; the Force Report describes these "extraordinary fluctuating values over a few weeks" as "highly troubling and irregular in art world practice."

18

To the extent that Carroll valued *Kabuki Tetrad* at less than $1.25 million, it would follow that Carroll valued *Pochade II* at an even greater price while exchanging those two works for *Pirate II*, a work he valued at $2.5 million.

Davis points out that Carroll paid $300,000 for each of the *Pochades* and then, by Carroll's own account, valued just one of the *Pochades* at $1.25 million just a few months later while exchanging it and *Kabuki Tetrad* for *Pirate II*.   Further, Carroll has stated in two other cases, one in this District and the other in state court, that the value of *Pochade II* in October 2006 was $1.25 million.   These statements are corroborated by the fact that Carroll consigned the two *Pochades* for $1 million each minimum net in July 2006, consigned *Pochade II* for $1.25 million minimum net in September 2006, and then consigned *Pochade I* for $1.5 million minimum net in November 2006.   Indeed, when Carroll consigned *Pochade II* back to SOG immediately after purchasing it, he consigned it for $750,000 minimum net payable to Carroll (or, in the alternative, for $500,000 plus 50% of sales proceeds over $500,000).   The Ewald Report concludes that the fair market value of each *Pochade* would have been $1 million as of the time Carroll acquired them.   Thus, Carroll paid $600,000 total in the 2006 Exchanges for two works valued by an expert appraiser to have been worth $2 million at the time and valued by Carroll himself at roughly $2.5 million just a few months later.

In a related vein, Davis notes that Carroll purchased *Graveyard on the Dunes* for $50,000 in April and *Standard Brand No. 2* for $100,000 in May as part of the 2006 Exchanges.   As stated above, Carroll later exchanged these two works for *Kabuki Tetrad*, assigning strikes prices of $175,000 to *Graveyard in the Dunes*, $225,000 to *Standard Brand #2*, and $400,000 to *Kabuki Tetrad*.   Carroll's shifting valuations of *Kabuki Tetrad*—from $1.25 million in one transaction to $400,000 in the next—indicate that he valued the combination of *Graveyard on*

19

*the Dunes* and *Standard Brand No. 2*, recently acquired from SOG for a total price of $150,000, at some price ranging from approximately $400,000 to approximately $1.25 million. The Ewald Report indicates the following fair market value appraisals as of the time of the 2006 Exchanges: *Graveyard on the Dunes* at $450,000 and *Standard Brand #2* at $200,000.

Carroll explains this discrepancy by stating that he re-catalogued the *Pochades* and thereby added an unspecified amount of value. Specifically, he states that he recatalogued them "in line with the 1985 Black and White exhibition catalogue as 1958-1964 creations, completely changing their meaning and significance." However, as Davis points out, while the January 11 cataloguing provided to Carroll by SOG dates a *Pochade* to "c.1956-58," the April 21 cataloguing from SOG dates a *Pochade* to "c.1958-64." Further, the SOG cataloguing given to Carroll for both *Pochades* listed the very same 1985 Black and White exhibition catalogue, which dates both *Pochades* to "ca. 1958-1964" and which was based on an SOG exhibition. Several other scholarly works and exhibition catalogues also dated the *Pochades* to 1958-1964, including Davis Catalogue Raisonné working papers created in 1996. Carroll does not address those materials or identify any independent novelty in his re-cataloguing of the *Pochades* that would explain the significant increase in value he attributes to his efforts.

Davis's second and third examples of "bargain basement" prices consist of two out of a set of four artworks that Carroll bought as a group from SOG in May 2006 for $210,000 and then resold to SOG in October 2006 for $650,000. The four works were *Drawing for Matches*, *Egg Beater No. 1*, *Drawing for Percolator*, and *Art Digest Cover*. Davis singles out two of these works for careful scrutiny: (1) *Drawing for Matches*, which was purchased by Carroll for $20,000 in May, sold to SOG in the $650,000 transaction, returned to Carroll in Fall 2006, and then sold to the Chrysler Museum for $148,000 in December 2007; and (2) *Study for Eggbeater*

*No. 1*, which was purchased by Carroll for $45,000 in May, sold to SOG in the $650,000

transaction, returned to Carroll in the fall of 2006, and sold by Carroll to a private collector for

$250,000 in March 2008.

Carroll explains that he "added value to [*Drawing for Matches*] by re-identifying and re-

cataloguing it."  Specifically, he states that he "purchased the work *Drawing for Form Study*,

1927, and it was as *Drawing for Matches*, 1927, with my revised cataloguing that it was sold to

The Chrysler Museum of Art."  Carroll notes that in May 2006, SOG consigned this work to

Babcock Galleries as *Drawing for Form Study*, 1927, for a net price to SOG of $28,000, and that

he offered $20,000 to Salander after learning that Driscoll had no interest in purchasing this work

at SOG's $28,000 net price.

In response, Davis observes that the provenance created by SOG during the 2006

Exchanges listed the title as "*Drawing for Form Study* (aka *Drawing for "Matches"*)" and

included a 1927 date.  That cataloguing cites a reference text, Karen Wilkin's *Stuart Davis*, that

includes this work under *Drawing for Matches* and that was also cited in Catalogue Raisonné

working papers created in 1996 that identify the primary title of the work as *Drawing for

Matches* (with an alternative title of "*Study for 'Form Study'*").  The final version of the

Catalogue Raisonné, published in October of 2007, lists the work as *Study for "Matches"* and

identifies *Drawing for Form Study* and *Drawing for "Matches"* as "other known titles."

Regarding *Egg Beater No. 1*, Carroll states that he bundled it with three of Davis's

seminal works in the final sale and that, having restored and reframed these drawings, he

consigned them "as a three work triptych of Stuart Davis's most important early works, for an

asking price of $450,000."  He argues that this justified the increased sale price.

21

The Ewald Report appraises the fair market value of *Drawing for Matches* as of the 2006 Exchanges at $120,000. With respect to the other three works included in the $210,000 purchase/$650,000 resale transaction, the Ewald Report indicates fair market appraisal values of $120,000 for *Drawing for Percolator*, $225,000 for *Egg Beater No. 1*, and $225,000 for Art Digest Cover. This report thus provides a $690,000 total appraisal value as of 2006 for the four works that Carroll purchased at that time for $210,000.

Davis's fourth example of a "bargain basement" price is *Drawing for a Report from Rockport*, which, according to Davis, Carroll purchased for $75,000 in February 2006 and then sold through a gallery in January 2007 for $225,000. Carroll indicates that he sold the work for $175,000, but admits its $225,000 value in his Response to Davis's 56.1 Statement. Further, Gary Snyder, who held the work on consignment from Carroll, stated in a deposition that he sold it for $225,000. Carroll explains the increase in value by asserting that he re-identified and re-catalogued it. Specifically, he states that "[w]hile SOG offered me *Drawing for Report from Rockport*, 1940 for $75,000, I re-identified and re-catalogued it as the more important *Black and White Variation on Town Square*, c. 1950-1964." Carroll elaborates that *Drawing for Report from Rockport*, 1940, was exhibited at Miami-Basel in December 2005 for an asking price of $125,000 and remained unsold, and that the $75,000 he paid for this work in the 2006 Exchanges reflected a 40% discount off of the Miami-Basel price. Carroll states that his re-cataloguing reflected the original cataloguing in Wilkin's and Agee's 1985 Black and White exhibition, as well as Driscoll's assessment of the significance of the work.

Davis questions Carroll's claim to have added value by re-cataloguing the work. Davis points to the 1985 SOG *Black and White* Exhibition and Catalogue, as well as the Catalogue Raisonné working papers dated to 1996, as evidence that it was already known in the art world

that this piece is properly identified as *Black and White Variation on Town Square*.  In her fair

market value appraisal of this work as of the time of the 2006 Exchanges, Ewald reports a

$200,000 value, as compared to the actual sale price to Carroll of $75,000.

Davis's final example is *Abstraction*, which Carroll acquired from SOG for $100,000 and

then consigned several months later for a minimum net price of $400,000.  Once again, Carroll

explains that he added value by re-identifying and re-cataloguing this work:

> I purchased the vertical painting—*Abstraction*, 1922-1923, 33 x 22
> in.—and identified and re-catalogued it as a horizontal, earlier and
> much more important work: *Abstraction*, 1922, 22 x 33 in., a
> pendant to *Coffee Pot (Eat)* in The Regis Collection, Minneapolis,
> and one of Stuart Davis' 1922 series of four imposing abstract still
> lifes [sic].  After I described this new revised cataloguing to Dr.
> Driscoll, who agreed with it, and I submitted the new cataloguing
> both to Proefssor Agree and to Davis for the Stuart Davis
> Catalogue Raisonné.

Davis responds by offering evidence that Carroll did not, in fact, identify anything new in his re-

cataloguing: whereas Carroll indicates that he added value by dating the work to 1922, Carroll

received provenance and cataloguing statements in the 2006 Exchanges that identified the work

as "c. 1922-1923," and the 1996 Catalogue Raisonné working papers, the 2007 Catalogue

Raisonné , and a 1987 SOG Exhibition Catalogue also date the work as 1922.

The Ewald Report ultimately concludes that the 15 Davis Works were worth $4,595,000

fair market value at the time of the 2006 Exchanges.  Carroll's purchase price for these works

was $1,445,000, representing approximately 31.45% of the fair market value; in other words, a

discount of 68.55%.[8]  All of the experts in this case agree that discounts from fair market value

are common under certain circumstances, including transactions involving dealers, large

---

[8] This description of the purchase price as $1,445,000 reflects the Court's conclusion, *infra*, that
Carroll's self-serving assertion about an extra $1,450,000 in value from *Leathery Leaves* must be
excluded as it does not suffice to create a "genuine" dispute of material fact.

volumes, atypical works, and galleries keen to shift their focus.  These discounts may depend on the state of the market and whether the seller owns the work or possesses it on consignment. Force adds that when a seller does not own a work, "I would say it is almost unheard of for the dealer to give a greater discount to another dealer than they would to a . . . private [purchaser]." Rosenberg indicates that "industry norms" encompass discounts "as high as 33 1/3% or even 40%."  No expert in this case identifies as normal in the art industry any discount figure higher than 40%.  All of the experts, however, agree that it is normal in the art business to resell works at a higher price than that for which they are purchased.

Surveying the values assigned to artworks sold to Carroll in the 2006 Exchanges, Debra Force notes that she has "reviewed the [Ewald Report's] fair market value appraisal of the Davis works as of January-May 2006" and that "[t]hose appraised values are generally closely in line with the prices at which Carroll or Earl Davis sold or consigned the Davis works, and are substantially greater than the prices at which Carroll acquired them."

### e.  Other Potential "Red Flags" in the 2006 Exchanges

The parties heavily dispute whether, in light of art industry norms, the 2006 Exchanges raised other red flags that should have put Carroll on notice of potential foul play.

First, Carroll states that he was justified in changing "owned by" to "sold by" in the Summary Exchange Agreement to reflect Fitzpatrick's clarification of his "assumption" that SOG had owned the works in the January-February transactions.  Debra Force, an expert on norms of commerce in the art industry hired by Davis, responds in her report that "Carroll's actions in simply changing the Exchange Agreements from 'owned by' SOG to 'sold by' SOG" were "highly improper" and that this switch should have created notice of questionable dealings when set in the context of art business commercial norms.

24

Second, the parties dispute whether the nature, structure, and scope of the 2006 Exchanges were unusual with respect to ordinary dealings in the art business and Carroll's prior dealings with SOG. Carroll points to his 1998 transaction with SOG, in which he exchanged 33 artworks for three paintings owned by SOG, as evidence that the 2006 Exchanges were not qualitatively different than his prior transactions with SOG. He does not indicate whether those deals were of a similar structure and complexity as the 2006 Exchanges. Carroll also cites testimony from Fitzpatrick, who answered "yes" when asked "[h]ad you done deals prior to this that involved multiple works of art by multiple artists owned by multiple consignors in one large group transaction to one buyer?" In the deposition, however, Fitzpatrick clarified that he was referring to a single 10- to 15-work transaction involving 19th century American paintings, adding "that is the one I could think of."

In support of Davis's position, Force offers this assessment of the 2006 Exchanges:

> In my experience, the scope and extent of the [Exchanges], and the way they were carried out and documented was highly unusual, and reinforce my opinion of the highly suspicion nature of the Transactions from the beginning and throughout, and that Carroll was on clear notice of serious problems with the proposed deals. In my years of experience, given the value of the artworks, the stature of the artists, and the importance of the artworks, particularly those of Stuart Davis, I have never seen anything similar to the way these [Exchanges] were structured and carried out.

> The [Exchanges] were far different than the sporadic transactions for a few works that SOG and Carroll had entered into over the previous six years. In a matter of months Carroll acquired 44 artworks by 13 different artists worth several million dollars, and the deals involved both artworks and cash going in both directions. The artworks and the prices were agreed upon in a matter of minutes. They were documented in a series of increasing, overlapping "Exchange Agreements," in which previously acquired works were then included in the next round of deals, which is itself highly unusual.

25

Davis and Force add that Carroll should been alerted to the irregular nature of this transaction by the fact that SOG was holding a clearance sale on inventory that SOG did not own and that SOG could far more easily have returned to the relevant owners.  Further, with respect to the question whether the 2006 Exchanges were similar to prior SOG arrangements with Carroll or other experienced dealers, neither party has identified any transaction of this sort in the over 180,000 pages of SOG documents produced by the SOG Trustee.

Force also notes that the separate May 22 Exchange/Buy-Back Agreement "appears to be little more than a very high-interest loan from Carroll to SOG, in which Carroll transferred $250,000 (and a Blakelock painting and photograph, valued by [Ewald] at under $5,000) to SOG for four Davis works, with SOG holding a 100-day option to repay the $250,000, and receive back three of the four Davis works."  In her view, "[s]uch an arrangement between dealers is certainly out of the ordinary."

Finally, the parties dispute whether Carroll was, or should have been, on notice of SOG's precarious financial position in early 2006.  Carroll and Alex J. Rosenberg, an expert on the art business, emphasize that SOG had a golden reputation in the art world as of early 2006.  Carroll adds that his awareness "at the time of the transactions at issue in this case" of a wealthy investor's involvement in SOG constituted "one reason for my belief in the financial viability and bona fides of SOG."  In his deposition, Carroll states that he first learned of this investor's involvement in SOG "sometime before the end of February [2006] . . . either the end of January, sometime in the period between the end of January and middle of February, 2006."  Davis argues that Salander's "inability" to make a "time of the essence" payment on December 28, 2005 put Carroll on notice of SOG's difficulties; Carroll responds by stating that he altered the terms of

this deal as part of the course of events surrounding *Yellow Rose*.  Finally, Davis cites deposition

testimony from Asher Edelman, another dealer, who recalled that Carroll told him that "typically

when Salander needed money he would give [Carroll] a call and Carroll would go down and buy

some pictures."  Edelman added that "[Salander] said that he needed money so come to the

gallery and pick up some pictures, that was clear."

        **3.**       **Due Diligence**

Carroll's due diligence in the 2006 Exchanges consisted of three actions: (1) he inspected

the SOG provenance and cataloguing for each of the subject works; (2) he physically examined

each work for signage, labels, or other markings indicating ownership; and (3) he personally

conducted a search of the New York State Department of State's public database of Uniform

Commercial Code security filings to determine whether any other party had claimed to possess a

consignment or security interest in any of the artworks.  The parties do not dispute that, in the

absence of any red flags, Carroll performed an amount of due diligence at least equal to that

which would be expected of an art purchaser in the usual course of dealing.  However, the parties

sharply dispute whether, according to norms of commercial dealing in the art industry, Carroll

conducted adequate diligence in light of the alleged signs of foul play.

Carroll states that none of this due diligence yielded cause to believe that SOG had

engaged in foul play in the 2006 Exchanges and, supported by Rosenberg, contends that this

amount of due diligence exceeds usual and customary procedures.  Carroll and Rosenberg add

that it would be highly unusual in the ordinary course of dealing for a potential purchaser to

check with an artist or an artist's estate to determine whether a gallery had the right to sell a

work on consignment.  By the same token, they state that it would be rare in the usual course of

dealing to ask a seller whether she owns a work of art or whether the piece is held on consignment.

Debra Force disputes the thoroughness of Carroll's due diligence.  She explains that Carroll's physical examination of the works would not be expected to reveal useful information; in her experience, "it is highly unusual for an art gallery to have any writing on the artwork that indicates the work is either on consignment or owned by the gallery . . . the absence of any writing on the artwork is of no consequence . . . ."  She also notes that "[t]he absence of U.C.C. statements in early 2006 would not indicate to an experienced art dealer whether a work was owned by the gallery or on consignment," because "[t]he filing of U.C.C. statements by consignors of artwork was not a common practice at this time."  Force observes that, by Carroll's own admission, Carroll had never filed a U.C.C. statement of this sort until around October 2005.  Therefore, in her view, "Carroll could not have reasonably concluded that SOG was the owner of the Davis works in January or February 2006, because there were no U.C.C. filings on the Davis works."

Force concludes that, as a matter of commercial reasonableness in the art business and in light of uncertainty regarding SOG's ownership of the Davis works, "it was unreasonable for Carroll to have relied on [the 'assumption' that SOG 'probably' owned the works], instead of inquiring directly whether Salander or SOG was in fact the owner."  This added due diligence, she explains, should have "include[d] not only inquiring of Salander, but also of the authors and preparers of the forthcoming Stuart Davis Catalogue Raisonné, or of Earl Davis himself as Stuart Davis scholar and publicly identified owner of many of the works."  Force notes that, by his own admission, Carroll knew that SOG maintained a price list of retail prices for each of the works included in the 2006 exchanges, but never asked to see it.  Force concludes that "under the

circumstances, the steps that Carroll identified as his 'normal due diligence' . . . were wholly inadequate to verify that the [Exchanges] were legitimate and authorized, at least with respect to the Davis works, and these steps provided no basis for such a conclusion."

### D.   Carroll Informs Davis of his Acquisition of the Eight Disputed Works

Davis and Carroll met for the first time on September 8, 2006 at SOG's Upper East Side gallery.  The meeting was unplanned.  Carroll remarked to Davis that he owned 14 Stuart Davis artworks, described the works, including the Eight Disputed Works, and invited Davis to view a listing of these works on Carroll's personal website.  Carroll told Davis of his desire that the Catalogue Raisonné Committee include updated cataloguing information and invited Davis to visit his collection of Stuart Davis works.  Carroll did not hear from Davis again until September 18, at which point Davis sent an e-mail asking for "a simple list of the works, the dates [Carroll] acquired them and from whom."  Carroll responded to this e-mail with the requested data and cataloguing information.  Carroll states that the next day, he spoke with Davis on the phone and invited him to visit and see the Stuart Davis works, but Davis declined.

Carroll states in his declaration that, at this point, Davis did not question Carroll about ownership of the Eight Disputed Works, nor did Davis question Driscoll after viewing several of the works on display at Babcock Galleries: "at no point during these conversations did Davis question my ownership of the Eight Disputed Works."  Carroll only refers in his declaration to "September 2006 conversations and communications" with Davis; Carroll then adds that his discussions with Davis "picked up again in April 2007."  In his declaration, Carroll makes no mention of any communications with Davis in October 2006.

Davis reports that he did not know about the deals between Carroll and SOG at the time they occurred, never authorized these deals, and was never paid anything by SOG.  He was

29

surprised to hear of Carroll's acquisitions in September 2006 and confronted Salander, who assured him that Carroll only had the artworks on consignment.  Carroll agrees that Salander told Davis that Carroll had the works on consignment.

Prompted by that conversation, Davis wrote to Carroll on October 10, 2006, that "I learned from Larry Salander that you have had a number of works of mine on 'consignment.' Since you indicated to me that [you] 'own' 12 works by my father and the catalogue raisonne has no other records of works in your collection – I would very much appreciate if you could please explain."[9]  Carroll replied the next day, but his response did not address Davis's request for clarification on the consignment versus ownership issue.  Davis replied later that day.  His e-mail stated "At this point, it has become a matter of extreme curiosity to make sure that the catalogue raisonne has the works in your collection accounted for.  As much information on these works that you can provide, the better."  In his deposition, Carroll recalled this October 2006 e-mail exchange.  He stated in that deposition that he sent, and Davis received, a CD with all the information relevant to the Catalogue Raisonné, and that "I know he certainly got it because he started sending me back e-mails saying that he saw one piece of mine – a bunch of pieces of mine in Babcock Gallery and he was asking me to explain it, blah, blah, blah."

In October and November 2006, Carroll sold or traded back to SOG seven of the Fifteen Davis Works.  Salander, in turn, returned those works to Davis.

Carroll and Davis resumed their discussion in April 2007, when Carroll—at Davis's request—e-mailed a listing of his Stuart Davis works on April 23, 2007.  This list included the Eight Disputed Works.  Davis responded the next day to inform Carroll that the deadline for inclusion in the Catalogue Raisonné had passed, but added that he was keeping updated records

---

[9] Davis has submitted these e-mails as exhibits and they are part of the record in this case.

for a possible addendum and that "now would be a good time to let me know whether and how you like to be listed as the owner of these works."  Carroll replied the next day to confirm that, as the owner of the Eight Disputed Works, he should be identified as "The Honorable and Mrs. Joseph P. Carroll."

On May 23, 2007, Davis visited Carroll's apartment.  Carroll states that Davis "confirmed the accuracy of my re-cataloguing of the provenance statements which stated that he was, in fact, the source of Davis Works I had purchased from SOG LLC."  Davis also inquired about how much Carroll had paid for each piece, prompting Carroll to reply that "if [Davis] did indeed own the works as he represented, he should simply ask Salander."

Carroll ultimately refused Davis's demand for return of the remaining works, i.e., the Eight Disputed Works.

### E.      Procedural Posture

On February 6, 2009, Davis filed a Complaint against Carroll and Carroll Limited.  He then filed the Amended Complaint on April 15, 2009, alleging claims against Carroll for conversion, replevin, unjust enrichment, and declaration of ownership, all with respect to the Eight Disputed Works.  Carroll asserted counterclaims for declaratory judgment and fraud, as well as an affirmative defense based on N.Y. U.C.C. Article 9.  Davis ultimately moved to dismiss the fraud counterclaim and to strike the Article 9 defense.  Both of these motions were granted from the bench on January 26, 2011.

Meanwhile, on November 13, 2009, the Court issued a TRO restraining Carroll from offering for sale, transferring, selling or otherwise disposing of five of the Stuart Davis works at issue in this case.  On December 9, 2009, the Court granted a motion for an emergency order to secure these Stuart Davis works after learning that they were being offered for sale on behalf of

Carroll in Miami, Florida.  Pursuant to that order, the five unsold Stuart Davis works are

currently housed in a warehouse in Manhattan.  Following a period of discovery, Davis filed

motions to strike the testimony of Alex Rosenberg, to sanction Carroll for perjury and/or

spoliation, and for summary judgment.

## II.     Motion to Strike

Davis has moved to strike the appraisal and expert report of Alex J. Rosenberg ("the

Rosenberg Report").  This report has been introduced and relied upon by Carroll to establish two

critical propositions: first, that Carroll's transactions with SOG were consistent with usual and

customary practices in the art industry; and second, that Carroll paid reasonable consideration for

the Eight Disputed Works and the other artworks purchased in the 2006 Exchanges.

### A.      Legal Standard for Admissibility of Expert Testimony

It is well settled that courts may rule on evidentiary determinations, including motions to

strike expert testimony for failure to comply with Federal Rule of Evidence 702, on motions for

summary judgment.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  Although courts

often hold evidentiary hearings before deciding motions to strike expert testimony, "[a] *Daubert*

hearing is unnecessary when the evidentiary record pertinent to the expert opinions is already

well-developed."  *Malletier*, 525 F. Supp. 2d at 581.

Federal Rule of Evidence 702(a) requires that a proposed expert witness be qualified on

the basis of "scientific, technical, or other specialized knowledge [that] will help the trier of fact

to understand the evidence or to determine a fact in issue."

Under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), district

courts are assigned a critical gatekeeping role at the boundary between real science and junk

science.  When district courts exercise that responsibility, the first question is "whether the

expert has sufficient qualifications to testify." *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 174 (E.D.N.Y. 2008) (citation omitted).  If an expert is deemed qualified, the next question is "whether the proffered testimony has a sufficiently reliable foundation." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotations omitted). "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702).  With specific respect to the reliability of "principles and methods,"

> [t]he Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Id.* at 266 (quotation marks and internal citations omitted).  "These factors do not constitute, however, a definitive checklist or test.  Rather, [t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Id.*  Expert testimony must also be relevant under Rule 401 and must not be unfairly prejudicial under Rule 403.  *See Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware, Inc.*, No. 06 Civ. 12988, 2009 WL 5173920, at *2 (S.D.N.Y. Dec. 30, 2009).

Sometimes, expert testimony does not rest on traditional scientific methods.  In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized

33

experience.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (citing Hand,

*Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L.Rev. 40, 54

(1901)).  Thus, "the *Daubert* factors do not all necessarily apply even in every instance in which

reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may

instead focus upon personal knowledge and experience of the expert."  *Bah v. Nordson Corp.*,

No. 00 Civ. 9060, 2005 WL 1813023, at *7 (S.D.N.Y. Aug. 1, 2005) (quotation marks and

citations omitted).

When an expert is introduced under *Kumho Tire*, however, district courts must still

exercise the gatekeeping function mandated by *Daubert*.  *See Malletier v. Dooney & Bourke,

Inc.*, 525 F. Supp. 2d 558, 579 (S.D.N.Y. 2007) ("[T]he Court in [*Kumho Tire*], made clear that

the gatekeeping function applies not just to scientific expert testimony as discussed in *Daubert*,

but also to testimony based on technical or other specialized knowledge.").  Accordingly,

proponents of expert testimony who rely on *Kumho Tire* must still reckon with the rule that "the

basic requirements of reliability—as they are now articulated in Rule 702—apply across the

board to all expert testimony."  *United States v. Glynn*, 578 F. Supp. 2d 567, 570 (S.D.N.Y.

2008).

Whether examining a witness under *Daubert* or *Kumho Tire*, "[t]he ultimate inquiry for

the district court is 'to make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field.'"  *Malletier*, 525 F. Supp. 2d at 580

(quoting *Kumho Tire*, 526 U.S. at 151).  Therefore, "a trial judge should exclude expert

testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and

contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (quotation marks and citation omitted). This is particularly true where a field is characterized by established standards for arriving at expert conclusions and a proposed expert fails to engage with those standards, departs from them in a report, or cannot cite published works in support of a position. *See Dev. Specialists, Inc. v. Weiser Realty Advisors LLC*, No. 09 Civ. 4084, 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012).

Although the Second Circuit applies a "presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), Rule 702 mandates that experts "stay within the reasonable confines of [their] subject area, and cannot render expert opinion on an entirely different field or discipline." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) *aff'd sub nom. Lappe v. Honda Motor Co. Ltd. of Japan*, 101 F.3d 682 (2d Cir. 1996) (citation omitted). In other words, "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes." *Malletier*, 525 F. Supp. 2d at 642; *see also United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("Under *Daubert* and Rule 702, expert testimony should be excluded if the witness is not actually applying [their] expert methodology."). In short, where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case.

Ultimately, these broad standards must be tailored to unique circumstances. *See Dev. Specialists*, 2012 WL 242835, at *8 ("The reliability inquiry is context-specific, and the question before the Court is not the reasonableness [of the expert's methodology] *in general*, but rather the reasonableness of using such an approach . . . to draw a conclusion regarding *the particular*

*matter to which the expert testimony was directly relevant*." (quotation marks and citations omitted)) (emphasis in original).  To that end, district courts enjoy broad discretion "in determining what method is appropriate for evaluating reliability under the circumstances of each case." *Amorgianos*, 303 F.3d at 265.  If a court concludes that an expert opinion "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266.

An expert's proponent bears the burden of satisfying these requirements. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Specifically, the proponent of the expert testimony must prove by a preponderance of the evidence that it is reliable. *Daubert*, 509 U.S. at 592.

### B.    Application of Law to Facts

Dr. Alex J. Rosenberg has produced an expert report at Carroll's request in which he offers his professional opinion about several key issues in this case.  Specifically:

> In brief, it is my professional opinion that, under the circumstances that I have reviewed, Carroll's conduct and the transactions in which Carroll purchased the artwork at issue in this case were consistent with usual and customary practices in the art industry. Based on my personal investigation and the data provided, I am aware of no "red flags" or warning signs by which, in my opinion, Carroll should have been placed on notice that there was anything improper regarding the subject transactions or that the sales violated the rights of anyone else to the artwork.  Finally, in my professional opinion, Carroll gave reasonable consideration in exchange for the works of art acquired from SOG.

Rosenberg possesses ample qualifications as an art appraiser and expert in the norms of the market for artwork.  These qualifications include Rosenberg's experience as a New York City gallery owner for 20 years, his work as an art appraiser for 40 years, his prior expert testimony as an art appraiser, advanced degrees from Philadelphia University and the Instituto Superior de Arte in Havana, certifications in the Uniform Standards of Professional Appraisal Practices, and

his membership in and status as former president of the Appraisers Association of America.  It is beyond cavil, and undisputed, that Rosenberg is qualified to offer expert testimony on art appraisal.  Indeed, in a case arising from some of the same facts as this dispute, another court in this District recently credited Rosenberg as an expert witness in that field.  *See Joseph P. Carroll Ltd. v. Baker*, No. 09 Civ. 3174, 2012 WL 3731404, at *6 (S.D.N.Y. Aug. 29, 2012).

Rather than argue that Rosenberg is unqualified, Davis has moved to strike the Rosenberg Report on grounds of relevance and reliability.  Davis argues that Rosenberg departed from established methods of appraisal, lacked an adequate basis in facts for certain of his conclusions, and offered irrelevant testimony by addressing only the undisputed question whether Carroll performed sufficient due diligence for a transaction where there were no "red flags" to suggest improper dealings.

In his report, Rosenberg "appraises" so-called "reasonable offering prices" ("ROP") for the artworks involved in the Carroll-Salander exchanges of art and money in January, February, April, and May 2006 ("the 2006 Exchanges").   Rosenberg includes ROP calculations to support his conclusion that Carroll gave reasonable consideration for the artwork acquired from Salander in the course of these transactions.  Rosenberg then relies on these ROP calculations to determine that Carroll received a 25% discount, which the Report characterizes as "on the lower end of industry norms."  Examining the ROP values and the supposed 25% discount, Rosenberg adds that "the price Carroll paid does not appear to have been too low, or one that should have warranted Carroll to be suspicious."  Thus, Rosenberg "believe[s] that [his] appraisal determining the value of the traded artworks reveals that the trades were within the standard, accepted commercial norms for the art business."  In sum, Rosenberg argues that the values

Carroll assigned to artworks in the 2006 Exchanges constituted reasonable consideration and therefore would not have raised red flags to a sophisticated actor like Carroll.

Because this argument pivots on Rosenberg's self-described "appraisal" of ROP values, Rule 702 demands scrutiny of his appraisal methodology.  This is where Rosenberg's testimony flounders.  Simply put, these ROP values appear to hinge on nothing more than Rosenberg's ungrounded speculations about what prices might have seemed reasonable at the time to Carroll and Salander, accounting for a battery of unspecified circumstantial considerations.

As Rosenberg acknowledged in his deposition, art appraisal is a professional field governed by norms of expert practice.  These include standards promulgated by the Uniform Standards for Professional Appraisal Practice ("USPAP"), the Appraisers Association of America ("AAA"), and the American Society of Appraisers ("ASA").  Appraisers, including Rosenberg, rely upon compliance with these standards, among others, to produce expert art appraisal opinions that reflect accepted professional wisdom and methodological rigor.  *See, e.g.*, *Joseph P. Carroll*, 2012 WL 3731404, at *6-8; Sofia Adrogue and Alan Ratliff, *Kicking the Tires After* Kumho*: The Bottom Line on Admitting Financial Expert Testimony*, 37 Hous. L. Rev. 431, 508 (2000) ("The USPAP represents a logical starting point when considering acceptance within the appraisal community . . . .").  Whether understood as a scientific method under *Daubert* or as a form of specialized knowledge under *Kumho Tire*, art appraisal pursuant to these established methodologies might be admissible in federal court under Rule 702.

In this case, however, Rosenberg did not apply any established methodology.  By his own admission, Rosenberg did not rely upon AAA, ASA, or USPAP standards—none of which contain a definition of ROP or establish norms for ascertaining ROP values.  Rosenberg's report contains no glossary of terms, does not list and justify the factors used to calculate ROP values,

and does not set forth a statement of assumptions.  Rosenberg admitted in his deposition

testimony that he has neither presented nor published any scholarship on ROP and that he cannot

identify any published work in the field of art appraisal to demonstrate acceptance of ROP as a

valid methodology.  Rosenberg further acknowledged that he could not identify any instance of

the IRS or a court of law accepting ROP "appraisal" values.

Standing alone, novelty is not a sufficient basis for the exclusion of a proposed expert

methodology on grounds of unreliability under Rule 702.  But it is a basis for skepticism and

caution, since *Daubert* directs courts to consider, among other things, whether a technique has

been tested, subjected to peer review and publication, and generally accepted in the relevant

scientific community.  *See Amorgianos*, 303 F.3d at 266.  This rule also applies under *Kumho*

*Tire*, which demands the same level of methodological rigor from an expert in the courtroom as

in the expert's ordinary practice.  *See Malletier*, 525 F. Supp. at 580.  Thus, when presented with

a novel methodology—or a novel application of a familiar methodology—courts must conduct

with particular care their Rule 702 inquiry into reliability.

In a declaration, Rosenberg aggressively defends his ROP value methodology.  He

explains that, as part of his ROP appraisals, he

> utilized the same well-established and widely appreciated appraisal
> techniques that [he] has used for a great number of years . . . for
> each appraised work, [he] examined auction results for several
> works of art that were comparable to the appraised work by artist,
> period, medium, and size, among other criteria.  In conformity with
> accepted practice, [he] did not use for such "comparables" auction
> sales that took place after the date on which Carroll purchased the
> subject work (unless the auction catalogue for the subject work had
> been published already, prior to Carroll's purchase).

Rosenberg then determined the "aggregate sum of the reasonable offering prices of all the art

acquired by Carroll from SOG during the approximately six-month period in question," since "in

[his] experience, when art dealers purchase multiple works of art under such circumstances, it is necessary to view the transactions as a whole in order to determine their economic substance." Once Rosenberg arrived at his aggregate ROP value, he compared it to the actual transactions to conclude that Carroll must have received a 25% discount.

Some of this testimony is undercut by Rosenberg's deposition, which plainly indicates that he did not apply "the same well-established and widely appreciated appraisal techniques that [he] has used for a great number of years." To the contrary, as he stated: "I've never had this type of appraisal before," "I was not doing a typical appraisal," and "I would say that my work here is unique." More significantly, Rosenberg did not actually apply any of the well-established methods—AAA, ASA, or USPAP—that he helped to develop. Rather, Rosenberg takes the more radical step of suggesting that those methodologies simply do not apply because fair market value (FMV) is the wrong tool for measuring value in this sort of transaction:

> [In] [t]he dealings between two experienced [dealers], there is no fair market value or any other value. There's merely a combination of costs and values and what each one sees as where his profit or his edge comes in, and they make a deal based on that. And it was just—my main job was to determine whether this was an equitable transaction . . .
>
> I think that when you have a transaction or potential transaction between two highly experienced people, you try to read what's going through their minds. Each one is looking at the deal differently, where one thinks he can make a profit, where the other one thinks he's getting the edge. It varies. It's not the same or there never would be a deal because both would have to see themselves making a profit. You are trying to assess a business transaction. This is not an appraisal. This is an attempt to assess whether there was an equitable business transaction.

Rosenberg also clarified that "I'm acting here as an expert, not only as an appraiser, so that my interest here was not to come up with a fair market value or replacement value appraisal. My

interest here was to see whether or not the transaction between the two was a fair transaction, whether both got what they paid for."  The clear suggestion is that FMV does not apply and that Rosenberg's alternative approach is more ideally suited to the circumstances of this case.

The tension between Rosenberg's insistence on adherence to established methodologies and his repeated admission of departures from those methodologies undercuts his credibility as a proponent of his method's reliability.  But even if the Court were to agree with Rosenberg that FMV is not the appropriate appraisal method, and that the facts of this case give rise to a need for methodological innovation, Rosenberg's ROP "appraisal" would still need to survive Rule 702 reliability requirement on its own terms.  *See Glynn*, 578 F. Supp. 2d at 570.  The bare fact that Rosenberg has been admitted as an expert witness while applying his well-established appraisal methodology does not allow him a free pass to innovate, nor does it endow his innovations with a presumption of reliability.  *See Lappe*, 857 F. Supp. at 227.

Rosenberg's ROP appraisal, which selectively mixes aspects of standard appraisal practice with a speculative assessment of how the parties to a substantial transaction might have viewed each work, does not survive scrutiny.  At no point in his report, deposition, or declaration does Rosenberg clarify the full set of factors that play a role in this analysis, nor does Rosenberg explain how these factors interact or how much weight each factor is assigned in his calculus. Unmoored from standard appraisal techniques, even the portions of the Rosenberg report that draw upon such familiar tools as use of "comparables" to ascertain values are suspect, since the discipline reflected in a certification of compliance with established appraisal standards cannot be imputed to these analyses.  Further, even if the Court could credit Rosenberg's reliability with respect to the more rigorous portions of the report, Rosenberg admits to accounting for an array of speculative factors—many involving the whole structure of the deal and how each of the

participants might have sought advantage—that blend inextricably with the rest of his analysis. This makes it impossible to ascertain how, exactly, each ROP value has been calculated and whether the underlying methodology is reliable.

In sum, because it is not premised on a reliable methodology, Rosenberg's ROP appraisal values must be stricken from the record pursuant to Rule 702.  Under *Daubert*, Rosenberg has failed to adduce any of the traditional—though non-exhaustive—indicia of reliability.  Under *Kumho Tire*, Rosenberg has failed to link his personal knowledge and experience to the issue in a non-speculative and non-conjectural manner.  In any event, neither *Daubert* nor *Kumho Tire* tolerates expert testimony that departs from scientific or professional standards and cannot be independently justified  as a reliable analytic tool.[10]  Accordingly, Rosenberg's expert opinion that Carroll paid reasonable consideration for the acquired works must be stricken.

This ruling includes Rosenberg's ROP values and the 25% discount premised on the aggregate ROP calculation.  It also includes his broader conclusion that the 2006 Exchanges were commercially reasonable; by Rosenberg's own admission, "in order to determine the

---

[10] Further, even if the Rosenberg Report employed a reliable methodology, it might still be stricken for failure to apply those methods reliably to the facts of this case.  Rosenberg explains that his appraisal hinges, in part, on an assessment of the particular structure of the deal and of "what's going through their minds."  Yet Rosenberg also states that "I didn't know specifically the relationship [between Salander and Carroll], the discussions and all of that.  All I was looking to see is whether—what Carroll gave, what he received and whether he received a discount that was reasonable."  It is unclear how Rosenberg could reliably evaluate this particular deal with his ROP appraisal methodology while also remaining uninformed about such critical details as what relationship obtained between the participants and what strategic ends their negotiations served. *See, e.g.*, *Amorgianos*, 303 F.3d at 266 ("When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

equitable transaction, I had to determine whether these were reasonable prices."[11]  Finally, it encompasses his ROP-contingent testimony that Carroll received a discount within this range from Salander in the 2006 Exchanges.  It does not, however, include his testimony about bases for a discount in the ordinary course of gallery business—a change from American Modernism to Renaissance Art, dealer discounts, volume discounts, and works of an atypical nature—or his testimony that industry norms tolerated discounts "as high as 33 1/3% or even 40%."

The Rosenberg Report also concludes that the 2006 Exchanges "comported with usual and customary practices."  In other words, as Rosenberg explains earlier in his report, "[b]ased on my personal investigation and the data provided, I am aware of no 'red flags' or warning signs by which, in my opinion, Carroll should have been placed on notice that there was anything improper regarding the subject transactions . . . ."  Rosenberg makes three points in support of this conclusion: (1) SOG enjoyed a stellar and trustworthy reputation at the time of the 2006 Exchanges; (2) the "series of overlapping transactions between Carroll and SOG . . . while not common, are part of the way the art business is done on this scale in the art industry"; and (3) it is "not uncommon" in the art business to pay for art with art.

With respect to this portion of his testimony, Rosenberg is acting as a *Kumho Tire* expert: his conclusions are based on personal knowledge and experience.  Of course, any such testimony must "rest[] on a reliable foundation and [be] relevant to the task at hand."  *Daubert*, 509 U.S. at 597; *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Nimely v. City of New*

---

[11] Rosenberg also answered "That's correct" when asked "To determine whether it was equitable, you needed to do an appraisal?"

*York*, 414 F.3d 381, 396-97 (2d Cir. 2005) ("We have previously stated that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."" (quoting *Amorgianos*, 303 F.3d at 266)).  Where an appraisal or other expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702.  *See, e.g.*, *Edge Group WAICCS LLC v. Sapir Group LLC*, 705 F. Supp. 2d 304, 316 (S.D.N.Y. 2010); *E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Dr. Borgida's opinion must be excluded because he relied on insufficient facts and data . . . .  He made no effort to ensure that the materials that he reviewed were representative.").

As applied here, *Daubert* and *Kumho Tire* require the Court to strike Rosenberg's conclusion that Carroll should not have been alerted by "red flags."

First, given that the Court has already stricken Rosenberg's opinion regarding reasonable consideration in the 2006 Exchanges, Rosenberg cannot testify about price as a potential red flag. Accordingly, given that his expert report does not address one of the most significant "red flags" identified by Davis, Rosenberg lacks an adequate factual basis for the general conclusion that the 2006 Exchanges were not transacted in the shadow of a red flag.

Second, by his own admission, Rosenberg based his conclusion on certain factual assumptions.  In his deposition, Rosenberg identified several of these assumptions, including SOG's right to sell the Disputed Works and a business relationship between Davis and SOG that authorized a 50/50 split between consignor and dealer in the event of a sale.  These assumptions, however, lack *any* basis in the record.  To the contrary, the record discloses that another prominent art expert, John Paul Driscoll, informed Carroll *during* the 2006 Transactions that

Davis, not Salander, owned the Disputed Works.  It also discloses a number of other noteworthy

issues pertaining to ownership, all of which are discussed *infra*.  And the record says *nothing*

about Carroll's actually relying on the (incorrect) assumption of a 50/50 deal between Davis and

Salander to explain prices that otherwise seemed low to him.[12]  Rather, Carroll maintains that the

prices seemed perfectly reasonable on their own terms.  In any event, Rosenberg's failure to

reckon with any of the record evidence about disputed ownership—one of Davis's main alleged

"red flags"—further undermines the reliability of his expert testimony.

Finally, the Rosenberg Report makes a number of factual assertions that Rosenberg, in

his deposition, is entirely unable to support.  For example, the Rosenberg Report describes a deal

of this sort—involving multiple works of fine art by major artists—as "part of the way the art

business is done on this scale in the art industry."  Yet in his deposition, when pressed for details

on a similar transaction between two dealers, Rosenberg was unable to muster even one example

of business being conducted in this manner:

> Q.  Okay.  In your report, you give me your expert opinion that
> these deals were not unknown, and I need you to give me – since
> in your report you didn't give me any examples, I need you to give
> me some examples
>         MR. UDELL: Objection[13]
> A.  It didn't strike me – it did not strike me as abnormal.
> BY MR. GOLDSTEIN:
> Q.  Okay.  You can't give me an example?

---

[12] This is the only possible scenario in which the deal between Salander and Davis could implicate the question whether Carroll should have been on notice of foul play due to low prices. If Carroll did not know of any such relationship, then he still should have questioned the prices—even if his own expert, better informed about customary consignor-consignee arrangements, would not have done so.  If Carroll did know of such a relationship, then either he knew its precise terms or assumed a 50/50 deal.  In the former case, Rosenberg was unjustified in this assumption.  In the latter case, Carroll should have testified to that effect in his deposition and declaration, instead of stating that he saw no problem at all in the prices.

[13] This objection is overruled.

A.  (Witness shook head.)
Q.  The answer is "No"?  You shook your head . . .
        THE WITNESS:  I can't give him any example

Later in his report, Rosenberg states that "according to Carroll *and the cataloguing provided to Carroll*, at the time of the transactions Mr. Salander represented to Mr. Carroll that SOG was the owner of the art in question and had legal title" (emphasis added).  In his deposition, however, Rosenberg admitted that "it's hearsay" and, when asked if there is any such cataloguing document, responds "I don't know."  This lack of a factual basis for certain parts of Rosenberg's testimony calls sharply into question his authority to testify as an expert under Rule 702.

        Both individually and in combination, these flaws in the Rosenberg Report require the Court to strike Rosenberg's testimony that "the transactions comported with usual and customary practices" and did not raise any "red flags" or "warning signs."  Rosenberg cannot address prices as a potential red flag, relies on certain assumptions unsupported or contradicted by the record, and offers at least several significant statements in his report that he cannot support with facts.  Accordingly, Rosenberg's expert opinion that Carroll should not have been placed on notice of foul play by "red flags" in the 2006 Exchanges must be stricken.

        This ruling encompasses Rosenberg's statements that the "series of overlapping transactions between Carroll and SOG . . . while not common, are part of the way the art business is done on this scale in the art industry."  It does not, however, encompass Rosenberg's testimony that SOG was "considered to be among the most reputable art . . . galleries in the U.S.A." in early 2006, "particularly with respect to 20th century American artists such as Stuart Davis."  Nor does it encompass Rosenberg's testimony that exchanges of art for art are "not uncommon."

46

Finally, Rosenberg asserts at the end of his report that it "is not the norm in the industry" for a prospective buyer, such as Carroll, to inquire of an owner or consignor, such as Davis, "whether the sale terms were authorized."  Rosenberg explains that, particularly in light of SOG's reputation, Carroll's U.C.C. search, Carroll's physical examination of the artwork at issue, and Carroll's inspection of the written cataloguing provided by SOG constituted "more than the customary 'due diligence' that would be expected of an art dealer in this situation." Rosenberg adds that he has never heard of a "potential buyer[] checking with an artist or an artist's estate to determine if a gallery has the right to sell a work of art."

This final section of the Rosenberg Report hinges entirely on Rosenberg's analytically prior conclusion that Carroll had no reason to suspect foul play.  Rosenberg does not testify about art business norms concerning the duties of heightened due diligence that apply where a prospective purchaser is alerted by red flags to the need for further inquiry.  Because the parties do not dispute that Carroll performed adequate due diligence in the absence of such red flags, this part of Rosenberg's proposed expert testimony is irrelevant to the legal question in this case. It is black letter law that "[u]nder *Daubert*, trial judges are charged with ensuring that expert testimony . . . 'is relevant to the task at hand.'" *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998) (quoting *Daubert*, 509 U.S. at 597).  Accordingly, Rosenberg's testimony about Carroll's "more than customary" compliance with art business norms of due diligence in the absence of red flags is stricken on grounds on relevance.  However, to the extent that it bears on the question of what form a heightened duty of due diligence should assume in the art business, his testimony is deemed relevant and admitted.  This includes Rosenberg's testimony that it would be exceptionally unusual for a prospective purchaser to inquire of a consignor before purchasing a work of art on consignment to a reputable gallery.

III.     **Motion for Summary Judgment**

    A.     **Standard of Review**

Summary judgment is appropriate in a case where the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008).  The moving party bears the burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" only if it will affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."  *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted).  Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper.  *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996).  For that reason, summary judgment on fact-intensive questions of subjective intent and state of mind is generally inappropriate.  *See Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 157 (2d Cir. 2000).  While the nonmoving party can defeat summary judgment by presenting evidence sufficient to create a genuine issue of material fact, it is well-

established that "[m]ere speculation and conjecture [are] insufficient to preclude the granting of the motion." *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

### B.    Legal Standard

#### 1.    Buyer in Ordinary Course of Business

In the New York City art market, "masterpieces command extraordinary prices and illicit dealing in stolen merchandise is an industry all its own." *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 314 (N.Y. 1991).  Nonetheless, "[t]here is surprisingly little law on the subject of title to art.  There are no New York . . . statutes which are applicable just to works of art.  And the case authorities are few . . . ." *Morgold, Inc. v. Keeler*, 891 F. Supp. 1361, 1365 (N.D. Cal. 1995).[14]  The legal principles that control this case, however, are well established and have been applied in several recent decisions.

These rules of law flow from Article 2 of the New York Uniform Commercial Code, which governs the power to transfer rights in a good.  It provides as follows:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have

---

[14] This statement applies to the questions at issue here, but also to many other dimensions of legal rules that govern transactions in art.  *See, e.g.*, Michael Madigan, *Orphaned Art Consignors: Confusion in the Courts and the U.C.C.*, 29 Cardozo Arts & Ent. L.J. 753, 754 (2011) ("The rights of consignors vis-à-vis the consignee's unsecured and secured creditors . . . lacks clarity."); Hilary Jay, *A Picture Imperfect: The Rights of Art Consignor-Collectors When Their Art Dealer Files for Bankruptcy*, 58 Duke L.J. 1859, 1885 (2009) ("The treatment of [art] consignment in bankruptcy has often been described as mystifying." (citation omitted));  Andrea E. Hayworth, *Stolen Artwork: Deciding Ownership Is No Pretty Picture*, 43 Duke L.J. 337, 339 (1993) ("To art collectors, museums, and other victims of art theft, the uncertainty surrounding the determination of their possessory rights to pieces of art is far from insignificant.").

been delivered under a transaction of purchase the purchaser has such power even though

> (a) the transferor was deceived as to the identity of the purchaser, or
> (b) the delivery was in exchange for a check which is later dishonored, or
> (c) it was agreed that the transaction was to be a 'cash sale', or
> (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods has been such as to be larcenous under the criminal law.

N.Y. U.C.C. § 2-403.

The parties agree that U.C.C. §2-403 governs this case. They also agree that at all relevant times, Salander, SOG, Carroll, and Carroll Limited were "merchants" as defined by N.Y. U.C.C. § 2-104(1), and that Davis "entrusted" the Eight Disputed Works to Salander and SOG within the meaning of § 2-403. As a result, at the time of the 2006 Exchanges, Salander possessed "voidable, as opposed to void, title, and [could] pass good title" only to a buyer in the ordinary course of business. *Interested Lloyd's Underwriters v. Ross*, No. 04 Civ. 4381, 2005 WL 2840330, at *5 (S.D.N.Y. 2005); *see also Graffman v. Espel*, No. 96 Civ. 8247, 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Under this provision, a buyer in the ordinary course of business will prevail over the claim of an owner who entrusted such items to the merchant."); *Kozar v. Christie's, Inc.*, 929 N.Y.S.2d 200, 31 Misc.3d 1228(A), at *7 (Sup. Ct. 2011) ("U.C.C.

50

2-403 . . . provides that an owner who entrusts an item to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the owner to a buyer in the ordinary course of business.").[15]  This case thus turns on whether Carroll qualified as a "buyer in ordinary course of business" on May 22, 2006, the date on which the 2006 Exchanges were restated and finalized.

As a general matter, New York law provides that

> "[b]uyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind.  A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . .

N.Y. U.C.C. § 1–201(9).  This definition, however, is modified when applied to merchants.

Under N.Y. U.C.C. § 2-103(1)(b), "'good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  Merchants

---

[15] In *Porter v. Wertz*, a New York appellate court explained that

> [t]he "entruster provision" of the Uniform Commercial Code is designed to enhance the reliability of commercial sales by merchants (who deal with the kind of goods sold on a regular basis) while shifting the risk of loss through fraudulent transfer to the owner of the goods, who can select the merchant to whom he entrusts his property.  It protects only those who purchase from the merchant to whom the property was entrusted in the ordinary course of the merchant's business.

53 N.Y.2d 696, 698 (N.Y. 1981).  Thus, a person who knowingly delivers his property to a merchant dealing in goods of that kind "assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser."  *Graffman*, 1998 WL 55371, at *3.  "The U.C.C. [thereby] enhances confidence in commercial transactions by protecting the innocent purchaser who buys from a merchant dealing in goods of that kind, even if the merchant acts unscrupulously."  *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06 Civ. 7871, 2009 WL 1108526, at *4 (S.D.N.Y. Apr. 24, 2009) (citations omitted).

are thus held "to a higher standard of 'good faith.'" *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06 Civ. 7871, 2009 WL 1108526, at *5 (S.D.N.Y. Apr. 24, 2009) (citations omitted).

In the context of the art market, a New York appellate court has explained the need for this heightened standard: "'Reasonable commercial standards of fair dealing in the trade' . . . should not and cannot be interpreted to permit, countenance or condone commercial standards of sharp trade practice or indifference as to the 'provenance,' i.e., history of ownership or the right to possess or sell an object d'art." *Porter v. Wertz*, 416 N.Y.S.2d 254, 257 (N.Y. App. Div. 1979) *aff'd*, 53 N.Y.2d 696 (N.Y. 1981). In other words, to prevent lackadaisical standards in the art business from affording a shield to either misconduct or fraud-conducive indifference, New York courts will not allow a buyer who conducts trivial due diligence to insist that "failure to look into [a merchant's] authority to sell [a] painting was consistent with the practice of the trade." *Id.* at 259. After all, it is precisely such "commercial indifference to ownership or the right to sell [that] facilitates traffic in stolen works of art." *Id.*; *see also* Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork*, 23 Seattle U. L. Rev. 631, 633 (2000) (reporting that "[t]he lax commercial conventions of the art trade have resulted in most stolen art being eventually owned by innocent good faith collectors." (footnote omitted)). Thus, under New York law, "[c]ompliance with custom" is "relevant but not dispositive because a customary practice might fall short of what a 'reasonable commercial standard' would require for 'fair dealing.'" Deborah A. DeMott, *Artful Good Faith: An Essay on Law, Custom, and Intermediaries in Art Markets*, 62 Duke L.J. 607, 634 (2012) (citation omitted).[16]

---

[16] Commentators have also argued for the creation of more robust legal duties of inquiry on the part of key market actors, including auction houses and museums, to bolster the pressure on purchasers of art to ascertain that sellers are not engaging in malfeasance or theft. *See, e.g.*, DeMott, *Artful Good Faith*, 62 Duke L.J. at 638. In some cases, these actors—including

Rather, in New York, "[a] merchant . . . might be required under the U.C.C. to take additional steps to verify the true owner of a piece of artwork." *Brown*, 2009 WL 1108526, at *5. This heightened duty of due diligence is triggered "where there are warning signs about problems in a sale." *Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593, 604 (S.D.N.Y. 2012) (quotation marks omitted) (citing *Brown*, 2009 WL 1108526, at *7; *Interested Lloyd's Underwriters*, 2005 WL 2840330, at *5; *Cantor v. Anderson*, 639 F. Supp. 364, 367-68 (S.D.N.Y. 1986); *Morgold*, 891 F. Supp. at 1368-69; *Porter*, 416 N.Y.S.2d at 254).

The seminal case of *Porter v. Wertz* is instructive. In *Porter*, plaintiffs entrusted a painting to a man they believed to be an art merchant. 416 N.Y.S.2d at 256. That man, in turn, gave the painting to an acquaintance who worked at a deli, who then sold it to the defendant art gallery. *Id.* The appellate court concluded that the art gallery did not qualify as a buyer in the ordinary course of business, since it had made no effort to "determine the status" of the person who sold it the painting. *Id.* at 257. "Had [it] done so much as call either of the telephone numbers [the seller] had left, [the art gallery] would have learned that [he] was employed by a delicatessen and was not an art dealer." *Id.* By the same token, the art gallery made no "effort to verify whether [the seller] was the owner or authorized by the owner to sell the painting he was offering," notwithstanding a catalogue of the master's works that included information on the disputed painting. *Id.* While "this knowledge alone might not [be] enough to put" a buyer on notice that a merchant lacks the right to sell a painting, "it could [raise] a doubt as to [the

Christie's and Sotheby's—have internalized such norms by generating policies designed to check whether they or their consignors can convey good title to the works that they sell. *See id.* A substantial portion of this legal analysis has taken shape in the shadow of an international trade in artwork stolen by the Nazis during World War II. *See, e.g.*, Kelly Diane Walton, *Leave No Stone Unturned: The Search for Art Stolen by the Nazis and the Legal Rules Governing Restitution of Stolen Art*, 9 Fordham Intell. Prop. Media & Ent. L.J. 549, 597 (1999).

merchant's] right of possession, calling for further verification before the purchase . . . [is]

consummated." *Id.* at 257-58.[17]

      *Porter* thus requires a measure of due diligence as a prerequisite to any claim of "buyer in

ordinary course of business" status. *See* 416 N.Y.S.2d at 257; *see also* Lawrence M. Kaye, *The*

*Future of the Past: Recovering Cultural Property*, 4 Cardozo J. Int'l & Comp. L. 23, 37 (1996)

(arguing that *Porter* implements the desirable policy of holding "dealers and collectors . . . to a

high burden of due inquiry into the provenance of cultural objects before acquiring them.").

---

[17] The decision of the First Department Appellate Division in *Porter* was affirmed on appeal, though on different grounds. Briefly addressing the duty of inquiry, the Court of Appeals noted that

> [o]n this appeal we have received *amicus* briefs from the New York State Attorney-General urging that the court hold that good faith among art merchants requires inquiry as to the ownership of an *object d'art*, and from the Art Dealers Association of America, Inc., arguing that the ordinary custom in the art business is not to inquire as to title and that a duty of inquiry would cripple the art business which is centered in New York. In view of our disposition we do not reach the good faith question.

*Porter v. Wertz*, 53 N.Y.2d 696, 701 (1981); *see also id.* at 700 (holding that U.C.C. § 403(2) was inapplicable for "three distinct reasons: (1) even if Peter Wertz were an art merchant rather than a delicatessen employee, he is not the same merchant to whom Porter entrusted the Utrillo painting; (2) Wertz was not an art merchant; and (3) the sale was not in the ordinary course of Wertz' business because he did not deal in goods of that kind." (citation omitted)). This holding by the Court of Appeals reflected the fact that the First Department's ruling in *Porter* rested on two grounds: the fact that the deli employee did not qualify as "a person in the business of selling goods of that kind" and the fact that the gallery owner did not act in good faith by virtue of a failure to conduct necessary due diligence. As a result, some courts have described this portion of the First Department's ruling in *Porter* as *obiter dictum*. *See, e.g.*, *Johnson & Johnson Products, Inc. v. Dal Int'l Trading Co.*, 798 F.2d 100, 104 (3d Cir. 1986). That position is the minority view, however, and "[m]any lower courts have held that to be a purchaser in the ordinary course within the meaning of § 2-403 an art dealer must investigate the provenance of a work of art being purchased, even if the work is being purchased honestly and from a reputable dealer." *Interested Lloyd's Underwriters*, 2005 WL 2840330, at *5 (collecting cases). This is the better reading of *Porter* for two reasons. First, *Porter*'s analysis of the due diligence duty is properly understood as an alternative holding—one to which that court plainly gave deep thought. Second, given that this Court must apply New York law, *Porter* offers the clearest statement by a New York court on the applicable policies and doctrine.

*Porter* also mandates an escalating duty of inquiry when the purchaser faces warning signs of foul play—often described as red flags.  *See Porter*, 416 N.Y.S.2d at 257-58; *accord Morgold*, 891 F. Supp. at 1368 (noting that, under New York law, "a dealer in art must take reasonable steps to inquire into the title to a painting, particularly if there are warnings that something is wrong with a transaction." (citations omitted)); *Leonardo Da Vinci's Horse, Inc. v. O'Brien*, 761 F. Supp. 1222, 1228 (E.D. Pa. 1991) ("The buyer has a duty to use due diligence when purchasing art, especially if there are circumstances surrounding the deal that would raise suspicion, such as a 'bargain basement' price." (citations omitted)); *Lindholm v. Brant*, 283 Conn. 65, 82 (2007) ("We agree with [*Porter*] that a merchant buyer has a heightened duty of inquiry when a reasonable merchant would have doubts or questions regarding the seller's authority to sell."); Sarah S. Conley, *International Art Theft*, 13 Wis. Int'l L.J. 493, 503 (1995) ("Art dealers' duty of inquiry has been held to extend to the appearance of suspicious circumstances, even absent knowledge that a sale may violate the ownership rights of a third party." (citations omitted)).

Ultimately, *Porter* establishes a legal duty of due diligence pegged to a higher standard of inquiry than may be customary in the art business and then creates an objective negligence standard as the test for whether a purchaser displayed "good faith" under "buyer in ordinary course" analysis.  *See* David Morris Phillips, *The Commercial Culpability Scale*, 92 Yale L.J. 228, 233 (1982) (citing *Porter* and explaining that "[t]he purchaser will be deemed to lack good faith if facts about the transferor's fraud abound, even if proof is lacking that the purchaser was aware of the fraud.").[18]  By offering an "extensive judicial statement on an art dealer's duty to

---

[18] At least one art expert has concluded that the rule announced in *Porter* has, in fact, encouraged greater diligence with respect to ownership and rights of sale in the art industry.  *See* Linda F.

investigate title," *Porter* "aid[s] the art industry in setting standards of good faith."  Deborah

DePorter Hoover, *Title Disputes in the Art Market: An Emerging Duty of Care for Art*

*Merchants*, 51 Geo. Wash. L. Rev. 443, 449 (1983).  This is particularly important given that

"[t]he industry's commercial practices have at times been inconsistent with the magnitude of its

sales" and that its efforts at self-regulation have, in at least some respects, proven inadequate to

thwart the fraudulent sale and purchase of artworks.  *Id.*[19]

     Although *Porter* was decided in 1979, and has been relied upon since that time by a

number of courts, New York law does not expressly identify the triggers of a duty of heightened

inquiry in the art industry.  Precedent inclines more toward the enumeration of possible red flags

than a detailed description of either commercial norms or legal duties.  As Judge Stein has noted:

> Examples [of red flags]. . . include (1) whether the sale price is
> obviously below market, (2) whether the negotiations or procedure
> of the sale differed from previous transactions between buyer and
> seller, (3) whether the buyer was aware of the seller's financial
> difficulties, or (4) whether the buyer would have reason to doubt
> the seller's ownership of the artwork.

*Baker*, 889 F. Supp. 2d at 604 (quotation marks and internal citations omitted); *see also Brown*,

2009 WL 1108526, at *7 (identifying sale prices "obviously below market" and a departure from

prior negotiations or procedures of sale as potential red flags); *Interested Lloyd's Underwriters*,

---

Pinkerton, *Due Diligence in Fine Art Transactions*, 22 Case W. Res. J. Int'l L. 1, 18 (1990)
("Since [*Porter* and another decision], there has been considerably more activity among art
dealers in New York in checking with the International Foundation for Art Research ("IFAR")
about the provenance of an object and the possibility that it may be stolen." (citation omitted)).

[19]  *See also* Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to
Valuable Artwork*, 23 Seattle U. L. Rev. 631, 637 (2000) ("The equitable foundation of the due
diligence obligation and its corresponding sensitivity to all surrounding facts and circumstances,
as well as to public policy concerns in stolen art cases, invite courts to impose a demanding, yet
fair and practical, standard upon the U.S. museums and private collectors that drive the
international market.").

2005 WL 2840330, at *5 (describing a delay between contract and delivery, and a difference between the purchase price and market value of a painting, as potential red flags); *Kozar*, 929 N.Y.S.2d 200, at *8 ("It appears to be generally accepted that, as a minimum requirement, a merchant dealing in art work would be under a duty to make a further inquiry as to a painting's ownership in the event there are suspicious circumstances underlying the transaction, such as a bargain basement price." (citation omitted)).[20]

In addition to the requirement that a "buyer in ordinary course" act in "good faith," U.C.C. §1-201(9) also requires that a sale under these circumstances "comport with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." This inquiry directs the trier of fact's attention to both norms of the art business and the norms developed in prior transactions between the relevant parties.

While guidance from precedent on the nature of red flags in art dealings is merely limited, it is virtually nonexistent on the question of what sort of heightened duty of inquiry attaches when red flags do create suspicion of foul play. *Accord Baker*, 889 F. Supp. 2d at 604 n.9 (noting that "[t]he precise extent of this 'added duty of inquiry' [remains] unclear"). Given that this duty is based in U.C.C. § 2-103(1)(b)'s requirements of "honesty in fact" and "observance of reasonable commercial standards of fair dealing in the trade," however, it is clear that this duty must be defined by reasonable commercial standards of the art business, with a floor of minimum requisite inquiry as defined by *Porter*. *See Graffman*, 1998 WL 55371, at *5.

---

[20] Admittedly, almost all of these examples are taken from cases holding that, on the basis of their respective factual records, these potential red flags did not actually rise to the level of cause for suspicion of foul play. The Court has discovered only a single case decided under New York law that actually finds a red flag trigger. *See Kozar*, 929 N.Y.S.2d 200, at *9 (finding a "red flag" based on a "bargain price" due to substantial discrepancy between $40,000 opening bids at auction and admitted $1,600 purchase price).

Thus, when *Porter* describes a duty of "further verification," it directs attention to commercial norms of the art business and requires the trier of fact to ascertain what forms of inquiry experienced participants in that business would consider appropriate in response to the red flags at issue.  In many cases, application of this rule may call for a fact-intensive inquiry guided by experts in art industry norms.

### 2.    Ratification

"Ratification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another."  *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376, 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993) (citations omitted).  "The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers."  *HSBC Bank USA, Nat. Ass'n v. Adelphia Communications Corp.*, No. 07 Civ. 553, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009) *aff'd sub nom. In re Adelphia Recovery Trust*, 634 F.3d 678 (2d Cir. 2011).  "[R]atification occurs when a principal, having knowledge of the material facts in a transaction, evidences an intention to affirm or adopt the transaction of his agent through his acts or words."  *Orix Credit Alliance*, 1993 WL 183766, at *4 (citations omitted).  It "requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement."  *Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987).  Thus, "[t]he act of ratification, in whatever form, must be performed with full and complete knowledge of the material facts relating to the transaction, and the intention to authorize another's acts must be clearly established and may not be inferred from equivocal acts or language."  *Orix Credit Alliance*, 1993 WL 183766, at *5.  Intent to authorize may be "implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of

58

ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events." *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F. Supp. 748, 752 (S.D.N.Y. 1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir. 1969).

### C.   Application of Law to Facts

#### 1.   The 2006 Exchanges Raised Numerous Red Flags

New York law provides that a heightened duty of due diligence attaches where a purchaser is presented with reason to suspect foul play in a sale. This objective inquiry focuses on whether a sale was transacted in the shadow of red flags that should have put the purchaser on notice of potential illegality. Here, Davis identifies a number of such warning signs, including evidence of SOG's financial difficulties, evidence that SOG was dealing in fakes, mixed signals regarding SOG's right to convey valid title to the Eight Disputed Works, Carroll's use of special documentation, and bargain basement pricing. Even read in the light most favorable to Carroll, the record evidence in this case dictates a finding of numerous red flags.

#### a.   SOG's Financial Difficulties & Dealing in Fakes

As Judge Stein noted in *Baker*, a red flag may exist where "the buyer was aware of the seller's financial difficulties." 889 F. Supp. 2d at 604. In retrospect, describing Salander's financial position as one of "difficulty" may seem like a study in understatement. Yet the 20/20 vision afforded by hindsight is not the appropriate vantage point. Rather, the question is whether, at the time of the 2006 Exchanges, Carroll should have known of SOG's financial difficulties.

Carroll states in no uncertain terms that he was unaware of SOG's precarious position and, more importantly, that he had no reason to be aware of it. He explains that SOG enjoyed a golden reputation in early 2006, that SOG had recently moved to a palatial gallery in the Upper

East Side, and that in February 2006 he learned of a wealthy investor's involvement in SOG.  All the experts in this case agree that SOG appeared to be on solid footing in at the time and that details about its sordid dealings did not emerge until mid-2007.

Against all this evidence, Davis argues that Carroll should have been placed on notice of SOG's financial position by SOG's failure to make a "time of the essence" payment on December 28, 2005, SOG's refusal to take back the fake Murphy (*Yellow Rose*) unless Carroll purchased more art, and by Edelman's recollection that Salander would call Carroll to sell pictures when Salander needed money.

Crediting Carroll's version of the facts for purposes of this motion, the Court concludes that the "time of the essence" payment and the *Yellow Rose* affair, though unusual, did not signal beyond genuine dispute that Salander was in a tough financial position.  Rather, they reflected a creative accommodation between Carroll and Salander in response to an unanticipated course of events arising from Rothschild's charge that *Yellow Rose* had been misattributed.  Specifically, Carroll and SOG reworked their consignment/purchase option contract, thereby altering the terms of the deal in a manner that a reasonable fact-finder might conclude justified an extension of the payment schedule and Salander's insistence on "store credit."  As to the question whether Carroll should have been alerted to problems by Salander's sale of what Davis describes as an "obviously fake" *Yellow Rose*, Carroll has established a genuine dispute of material fact by explaining his interactions with Salander and the reasonable basis for his belief that Salander had not acted in bad faith.

Carroll's statements to Edelman that Salander would sell more works when he needed money is suggestive of a red flag, since it implies that Carroll was aware of Salander's less-than-

ironclad financial position.  At this stage in the litigation, however, it does little more than

provide fodder for a genuine dispute of material fact.

Because of a factual dispute concerning the information available to Carroll about

Salander and SOG's financial situation, no red flag is to be found here.

### b.      SOG's Authority to Sell the Eight Disputed Works

The single most important red flag under New York law consists of indications that the

seller neither owns the work nor enjoys authority to sell it.  Here, it is beyond doubt that Carroll

should have been alerted by numerous signs to serious questions about SOG's authority to sell

the Eight Disputed Works.[21]  Throughout his dealings with SOG, Carroll displayed the very

commercial indifferent that *Porter* prohibits.  No reasonable juror could find to the contrary.

Carroll's pattern of indifference and equivocation began with the 2000-2001 purchase of

five Davis works.  In his declaration, Carroll insists that he understood these works to have been

owned by SOG, notwithstanding provenance statements for many of these works that simply

listed "Estate of the Owner," citations in the cataloguing for these works to publications that

listed Earl Davis as the owner, and testimony in his deposition that "whether [the art] was owned

by the estate or owned by [SOG], I don't know."[22]  Even more striking, the paperwork for the

---

[21] Because the standard described in *Porter* is objective, Carroll's subjective understanding does not control.  A red flag exists where there were objectively clear warning signs of foul play, regardless of whether Carroll actually saw the issue.  In any event, whether the facts are examined at an objective level or with an eye to Carroll's subjective understanding, numerous red flags were present in the 2006 Exchanges.

[22] This is merely the first of many conflicts between his self-serving declaration and substantial record evidence, including his deposition.  "A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citations omitted).  "Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Id.*

2000-2001 transactions distinguished between works "owned by" Carroll and "sold by" SOG, a distinction that Carroll reaffirmed in the provenance statements for two of these works when he resold them in 2002.  It is clear from that evidence that Carroll was, at best, indifferent to who owned the Stuart Davis Works at the time of the 2000-2001 transactions.  It is equally clear that Carroll understood no later than 2002 that these works were *owned* by the Davis Estate and *sold through* SOG, as reflected in the provenance documents that he prepared in connection with a transaction for two of those Stuart Davis works.  No reasonable juror could examine these provenance documents—many of them created by Carroll and all of them reviewed by Carroll— and conclude that Carroll believed in January 2006 that SOG had owned the Stuart Davis works he had acquired from it in 2000-2001.

The next warning sign arrived in January/February 2006, when the four Davis works transferred from Salander to Davis were described in the relevant documentation as "owned by" SOG.  It is a basic duty of any purchaser of an object d'art to examine the provenance for that piece, and Carroll repeatedly affirms that he fulfilled that duty.  Yet none of the documentation associated with the transfer of these works listed SOG as the owner and Salander never told Carroll that he or SOG did, in fact, own the works.  Carroll has not pointed to any document that listed SOG as the owner.  To the contrary, the documents all listed "Estate of the Artist" as the provenance, in contrast to the documentation for several other works involved in the same set of exchanges that identified Salander, SOG, or Salander's wife as the owner.  As Force explains, "there was no reasonable basis" for Carroll to assume that SOG owned the Davis works and "all of the information Carroll had at that time . . . was inconsistent with Carroll's false claim that the Davis works were 'owned by' SOG."

Carroll insists that he simply "assumed that the owner was actually probably . . . Salander," notwithstanding the absence of any basis for that assumption in the documentation. This belief made sense, Carroll explains, because Salander had announced a desire to clear American Modernist inventory.  Carroll adds that "I mean frankly, to me, if it was on consignment he doesn't have to – he doesn't have to clean out his inventory, he just has to return it."  In other words, because it would have been so bizarre for Salander to "clean out his inventory" of works on consignment when he could just return those works to their owners, Carroll assumed that Salander or SOG must have owned the works—again, notwithstanding clear documentation to the contrary.

Even crediting Carroll with this assumption about SOG's ownership of the Davis works, yet another oddity emerges in Carroll's account: if Carroll realized in January/February 2006 that it would have been terribly strange to "clean out" an inventory of consigned works, why did he not ask Salander or anyone else at SOG about their clearance sale even after learning that the works were, in fact, on consignment from Davis?  Why did he not ask about the works on consignment from almost a dozen other owners?  Carroll never explains how a clearance sale on consigned work could seem so strange as to justify an assumption that SOG must have owned the works, yet not strange enough to raise red flags about a sale after Carroll learned that all of the pieces were actually on consignment.

In April 10, 2006, still under the assumption that SOG owned the Davis works, Carroll was informed by Driscoll that Morse had recently clarified that Carroll's new acquisitions came from "Earl Davis personally," not "the estate."  Carroll thus learned from a highly respected art dealer that the Davis works, contrary to the provenance statements created by Carroll and SOG, were not owned by SOG.  Nor were they owned by the Davis Estate.

63

Carroll decided to raise the issue of ownership with SOG employee Fitzpatrick, thereby indicating subjective awareness of cause for concern regarding the January/February exchanges. In his declaration, Carroll reports that Fitzpatrick affirmed the provenance statements from the earlier purchases, but clarified that these works came from Earl Davis personally and that Salander O'Reilly Galleries LLC was the proper counter-party.  Carroll adds in his declaration that he accordingly decided to modify the provenance statements to reflect these facts:

> *The artist and his Estate; to George Earl Davis, his son; to The Honorable and Mrs. Joseph P. Carroll, New York, New York (Acquired directly from the above through Salander-O'Reilly Galleries LLC, New York, New York)*

This new provenance switched "owned by" SOG to "acquired directly from the above through" SOG.  Thus, even on the version of facts that Carroll offers in his declaration, Carroll admittedly encountered a scenario in which shifting claims to ownership of the Davis works—by SOG, Davis, and the Davis Estate—raised a red flag.  Further, given Carroll's acknowledgement of the fact that it would have been odd for SOG to "clean out" so many works on consignment, Carroll presumably saw these fluctuations in ownership as of relevance to the transaction.

While discussing the same course of events in his deposition, Carroll told an even more problematic tale about the information he received from SOG about ownership of the Davis works.[23]  He stated that he spoke with Fitzpatrick, who "never actually gave [him] an answer." He recalled "conflicted documentation" and "not getting a clear answer either from Salander or from [Fitzpatrick]."  Nonetheless, even though "no one [was] confirming [that the Davis works

---

[23] Again, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial."  *Hayes*, 84 F.3d at 619; *see also id.* ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (citation omitted)).

he acquired were] from the estate or from Earl Davis," Carroll was apparently mollified by the fact that he was "just being told again that they are – you know, they are selling this stuff."  He added, "I really don't know."  Carroll never explains why the original documentation indicated that SOG "owned" the Davis works and apparently never inquired of SOG regarding that fact.

On April 19, 2006, he consigned to Babcock two works previously described as "owned by" SOG.  His provenance listed the works as "acquired directly" from Davis "through" SOG.  Debra Force opines that these actions were "highly improper," and adds that the need to switch around owners in the provenance documents constituted notice of questionable dealings.

Against this formidable evidence of foul play, Carroll musters little more than the undisputed facts that Salander enjoyed an impeccable reputation and was widely known as the exclusive representative for Davis and the Davis Estate.  It appears that, in Carroll's view, Salander's reputation essentially relieved all purchasers from SOG of any duty of heightened inquiry even in the presence of repeated and unmistakable signs of improper dealings.  This is true, he suggests, even where a question about ownership weighty enough to prompt a purchaser to inquire of the gallery is raised and the gallery nonetheless fails to provide a clear answer.

As it must at this stage in the litigation, the Court credits Carroll's statements that he had absolute faith in SOG's authority to sell the works.  But Carroll has not appeared in this case as an expert on art industry norms, and his bare assertion that SOG's reputation essentially allowed the gallery vast leeway does not afford him an unbreakable shield against summary judgment.  As Force explains, "even assuming that Carroll previously believed that SOG owned the Davis works, when Driscoll told him that the Davis works were owned by Earl Davis, and SOG would not give him a clear answer, Carroll should not have acquired an additional 11 Davis works, without proof that SOG owned the works, or that Earl Davis authorized their sale."  Force adds

65

that "no reputable art dealer" would have proceeded with the 2006 Exchanges after the events of

April 2006 "without express confirmation that Earl Davis approved the sales."

During the 2006 Exchanges, Carroll "assumed" that SOG "probably" owned the works

because it would have been strange to "clean out" inventory on consignment; asked no questions

about the oddity of such a clearance when he later learned that SOG did not own the works;

believed at different points in early 2006 that SOG, Davis, or the Davis Estate owned certain

artworks; switched "owned by" SOG to acquired "through" SOG in the provenance documents;

was initially given misinformation about the proper counter-party; was told by another dealer

that SOG did not own works that his documents said it owned; could not get a "clear answer"

from SOG; and received "conflicted documentation."  Ultimately, Carroll apparently concluded

that "they are selling this stuff"—and that was good enough for him.  The Force Report is crystal

clear regarding the impropriety and irregularity of these events.  The fact that Carroll did, in fact,

ask questions about ownership is a telltale sign, even though Carroll then abandoned his inquiry

after receiving nonresponsive answers.

In sum, even crediting Carroll and reading the facts in a light that flatters him, any

reasonable juror would conclude that the 2006 Exchanges raised a significant red flag that should

have placed Carroll on notice of the need for further inquiry.

### c.    Special Documentation

Davis argues that Carroll's distrust of SOG during the 2006 Exchanges is evidenced by

the fact that Carroll idiosyncratically insisted on using his own paperwork.  Here, Davis points to

Carroll's statements that Salander had "no control over his paperwork" and lacked a "centralized

protocol" for production of provenances.  Carroll claims that the main reason for use of his own

paperwork was his desire to preserve certain legal rights—including guarantees of authenticity,

rights to arbitration, and payment of legal fees.  While it may be possible to find a red flag where an art purchaser engages in conduct that clearly suggests distrust of a seller's documents, in this case the Court concludes that this issue presents genuinely disputed material facts.

### d.    Prices

New York law also identifies bargain basement prices as a critically important red flag in art transactions.  *See, e.g.*, *Brown*, 2009 WL 1108526, at *7; *Interested Lloyd's Underwriters*, 2005 WL 2840330, at *5.  That red flag was clearly present during the 2006 Exchanges, as separately evidenced by (1) the fact that Carroll valued these works at markedly higher prices shortly after acquiring them and (2) a significant discrepancy between the prices that Carroll paid in May 2006 and Ewald's fair market value appraisal.

The 2006 Exchanges began when Salander called Carroll and mentioned an "end of year 90 percent off sale."  Carroll claims that he interpreted this comment as a joke, but the subsequent course of dealings between him and Salander casts it in a very different light.  While genuine disputes of fact obscure some of the pricing arrangements, several clearly reflect shockingly low prices.  More importantly, the total value exchanged in the 2006 Exchanges, accounting for fair market appraisals and the substantial discounts common to this market, should have alerted any savvy market participant to foul play.

The series of transactions involving the *Pochade* works, *Graveyard on the Dunes*, and *Standard Brand No. 2* were bargain basement deals.  Each of the *Pochade* works was purchased for $300,000.  After buying *Pochade II* for $300,000 on January 11, 2006, Carroll consigned it back to SOG that same day for $750,000 minimum net.[24]  In other words, before he "re-catalogued" the work or otherwise added value, Carroll immediately placed the work on sale for

---

[24] These facts are based on the relevant documents rather than Carroll's inconsistent declaration.

more than twice its sale price.  After taking possession of both *Pochade* works in April 2006, Carroll states that he re-catalogued them and thereby substantially increased their value.  This statement, however, is flatly contradicted by substantial record evidence.  The changes that Carroll identifies were already present in the SOG cataloguing for the *Pochade* exchanged on April 21, had been listed in a 1985 Black and White exhibition and exhibition catalogue, were included in multiple scholarly works and exhibition catalogues, and were part of the Davis Catalogue Raisonné working papers.  Carroll does not address any of these inconsistencies, nor does he explain how this supposed re-cataloguing led to such a breathtaking spike in value, from $300,000 to well over $1 million in a series of consignments and art-for-art exchanges.  His expert, Rosenberg, remains conspicuously mute regarding Carroll's various "re-cataloguing" projects.  In sum, Carroll's self-serving affidavit, standing apart from any record evidence or any independent corroboration, does not create a genuine dispute of fact on this point.  *See Hayes*, 84 F.3d at 619 ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").  Given that Carroll promptly engaged in a series of transactions in which *Pochade I* and *Pochade II* were each valued at substantially over $1 million, and that Ewald offers a $1 million appraisal for each work as of early 2006, it defies belief that a savvy purchaser like Carroll saw $300,000 as anything other than an astonishingly low price.

This leads to *Graveyard on the Dunes* and *Standard Brand No. 2*.  These two works, purchased for a total of $150,000 in the 2006 Exchanges, were subsequently exchanged for *Kabuki Tetrad* and assigned strike prices totaling $400,000.  Yet in a recent transaction in which *Kabuki Tetrad* and *Pochade II* were exchanged for *Pirate II*, Carroll had assigned *Kabuki Tetrad* a strike price of $1.25 million, with the remaining $1.25 million value attributed to *Pochade II*.

68

Given the close temporal proximity of these transactions, it is implausible that *Kabuki Tetrad* shifted so dramatically in value, as the Force Report confirms.  This leaves Carroll on the horns of a dilemma: either he valued *Kabuki Tetrad* at around $1.25 million, in which case he actually valued *Graveyard on the Dunes* and *Standard Brand No. 2* at a price far higher than $400,000 (which already represented more than twice his purchase price for those works in the 2006 Exchanges), or he valued *Kabuki Tetrad* much less than $1.25 million, in which case he actually valued *Pochade II* at a higher price than $1.25 million and his $300,000 payment for that work in the 2006 Exchanges was even more of a steal.  In two other judicial proceedings, Carroll has assigned *Pochade II* a $1.25 million value, which suggests that *Kabuki Tetrad* was worth significantly more than $400,000—and, by implication, that his purchase price of $150,000 for *Graveyard on the Dunes* and *Standard Brand No. 2* was decisively below fair market value pricing.  The Ewald Report indicates the following fair market value appraisals as of the time of the 2006 Exchanges: *Graveyard on the Dunes* at $450,000 and *Standard Brand #2* at $200,000.

Davis also argues that Carroll paid bargain basement prices for *Drawing for Matches* and *Eggbeater No. 1*.  Carroll purchased *Drawing for Matches* for $20,000 and ultimately resold it to the Chrysler Museum for $148,000 in December 2007.  In his declaration, he explains that he added value by re-cataloguing the work from *Drawing for Form Study* to *Drawing for Matches*, though he does not justify the particular increase or confirm his assertion with expert testimony. In any event, just as with the *Pochade* works, Carroll claims to have added value by identifying the work under a title that had already been imputed to the work in a number of scholarly works, several of which were included in the SOG-Carroll cataloguing papers and in the working papers for the Catalogue Raisonné.  This claim falls entirely flat when set against the record, suggesting

that Carroll knew or should have known at the time of the 2006 Exchanges that $20,000 was an incredibly low price for *Drawing for Matches*—so low as to raise serious questions.

These five works—*Pochade I*, *Pochade II*, *Graveyard on the Dunes*, *Standard Brand No. 2*, and *Drawing for Matches*—suffice to prove the point: Carroll purchased a number of works in the 2006 Exchanges at bargain basement prices and then resold them within a short period at far greater prices (which generally approximated the fair market value assigned by Ewald on the basis of her blind appraisal). As a sophisticated market participant subject to the special duty imposed on merchants under the U.C.C., Carroll undoubtedly knew, or should have known, that these prices were too low, even when set against the art market's variable pricing norms.

This conclusion is independently supported by a comparison of Carroll's payment for the Fifteen Davis Works ($1,445,000) and Ewald's appraisal of the fair market value of those works at the time of the 2006 Exchanges ($4,595,000).[25]

---

[25] In his declaration, Carroll refers to a transaction involving *Leathery Leaves*: Salander supposedly identified that work as a 1917 piece, not a 1920-1924 piece, resulting in a deal that effectively added an additional $1,450,000 million value to the 2006 Exchanges. Carroll made this assertion on both days of his deposition in this case, and insisted at the time that the details of this arrangement had been memorialized in documents readily available to his attorneys and third parties. He later discovered that no such documents existed and his attorneys have since stipulated to that fact. However, because Carroll refused to stipulate that he would not claim that this deal occurred, Davis filed a motion to sanction Carroll for perjury or spoliation.

This self-serving assertion in Carroll's declaration does not suffice to create a *genuine* dispute of fact and therefore has no bearing on this summary judgment decision. *See Hayes*, 84 F.3d at 619. The 2006 Exchanges were well documented by Carroll and Salander. Carroll, in particular, maintained meticulous notes regarding his art purchases, reflecting his desire to keep clear documentation and of his distrust of SOG's documentation. The parties, moreover, have submitted thousands of pages of evidence and the SOG Trustee turned over voluminous discovery in relation to this case. The absence of any documents from Carroll or SOG relating to a supposed $1,450,000 side deal, coupled with the fact that Carroll's narrative has shifted in key respects from deposition to declaration, render it utterly implausible that this self-serving statement could create a genuine dispute of fact. It is also noteworthy that Carroll's own attorneys and expert witness both declined to include any reference to this assertion in their filings—a startling and suggestive omission from both documents. The Court therefore excludes

In other words, Carroll received a 68.55% discount from fair market value.  Rosenberg suggests that discounts may run as high as 40%, particularly when certain discount-relevant factors present in the 2006 Exchanges are in play, but says nothing about the appropriateness of higher discounts.  Force flatly concludes that the prices afforded to Carroll would have put any reasonable market participant on notice of foul play.  As she explains, "the prices at which Carroll obtained the Davis works were too good to be true."

**e.   Conclusion**

No reasonable juror could examine the transactions described above and conclude that Carroll undertook the 2006 Exchanges free and clear of cause to suspect improper dealings.  The bargain basement prices offered by Salander, along with a battery of irregular and suspicious issues pertaining to SOG's ownership of and right to sell the Eight Disputed Works, constituted red flags that triggered a duty of heightened inquiry on Carroll's part before any consummation of the 2006 Exchanges.

**2.   The 2006 Exchanges Did Not Comport with Usual and Customary Practices in the Art Industry**

U.C.C. § 1-201(9) requires that a sale under the circumstances of the 2006 Exchanges "comport with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  The 2006 Exchanges fail both parts of this test.

Davis argues in his filings that an examination of the 180,000 pages of discovery material turned over by the SOG Trustee fails to disclose any transactions similar to the 2006 Exchanges.

---

this fact from its analysis, as would any reasonable juror.  However, exercising its "broad discretion" in deciding whether to impose sanctions, *Corporation of Lloyd's v. Lloyd's U.S.*, 831 F.2d 33, 36 (2d Cir. 1987), and recognizing the high bar for a sanction based on perjury or spoliation, the Court denies Davis's motion to sanction Carroll.

In response, Carroll points only to a single deal in 1998 in which he exchanged 33 artworks for three paintings owned by SOG.  Rosenberg adds supportively that the exchange of art for art is "not uncommon."  Yet the record does not support Carroll's position.  Fitzpatrick, an employee of SOG, could recall only a single transaction involving 10 to 15 works in which multiple works of art by multiple artists owned by multiple consignors were exchanged in a single transaction to one buyer.  Neither Carroll nor Rosenberg could identify even one transaction in which this amount of money and art was exchanged, let alone a transaction of this magnitude over such a long period of time and subject to overlapping restatements.  Indeed, no party to this case has produced evidence of any similar transaction, even on a smaller scale, or of any other transaction involving a series of increasing, overlapping exchange agreements.  To the contrary, the Force Report states that the 2006 Exchanges "were far different than the sporadic transactions for a few works that SOG and Carroll had entered into over the previous six years."  Force adds that "I have never seen anything similar to the way these [Exchanges] were structured and carried out."

Thus, it cannot be said that the 2006 Exchanges comported with "the seller's own usual or customary practice" or with "usual or customary practices in the kind of business."  Given that there is virtually no record evidence of similar custom, and substantial evidence to the contrary, no reasonable juror could believe that the 2006 Exchanges "comport[ed] with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  This conclusion, in turn, offers even greater support to the finding that Carroll was subject to a duty of heightened inquiry in May 2006.

### 3. Carroll's Due Diligence in the 2006 Exchanges Was Insufficient Under the Applicable Duty of Further Investigation

Carroll conducted three forms of due diligence: inspection of the SOG provenance and cataloguing for each work, physical examination of each work, and a search of U.C.C. security filings.  Rosenberg states that this amount of due diligence is more than usual in the field, though he offers no specific information about the level of due diligence that is customary, about how much added due diligence might be common in scenarios where red flags are present, or about why these forms of diligence would be expected to answer the questions raised by those red flags.  Rather, Rosenberg merely summarizes Carroll's due diligence and concludes that "Carroll performed more than the customary 'due diligence' that would be expected of an art dealer" in a scenario that did *not* present reason to question SOG's ownership or right to sell.  Rosenberg adds that it is "not the art industry norm" to contact the owner of a work on consignment to ascertain whether a seller enjoys the right to sell an artwork.

Force points out that it is not the custom in the New York City art market to physically mark artworks with signs of ownership.[26]  She adds that U.C.C. security filings were rare in the art industry in late 2005 and early 2006, a fact evidenced by Carroll's admission that he only adopted this practice in late 2005.  Further, although Carroll insists that he examined all documentation that accompanied these works, he somehow overlooked the fact that the Stuart Davis works he acquired in January/February 2006 were listed as "owned by" SOG in the exchange paperwork—even though the provenance and cataloguing materials unmistakably identified Davis or the Davis Estate as the owner.  In Force's view, Carroll's due diligence was not reasonably calculated to clarify SOG's rights of sale.

---

[26] She also notes that when a consigner or gallery owner has added physical markings, the marks are often coded in a manner that would be incomprehensible to a purchaser.

The parties do not dispute that Carroll conducted adequate due diligence in the absence of red flags. Given the presence of red flags, then, the controlling question is what form a heightened duty of inquiry would have assumed and whether Carroll satisfied that duty.

In contrast to Rosenberg, who declined to offer expert testimony on what forms of due diligence would be common in the art industry in the presence of red flags and whether Carroll satisfied those obligations, Force offered detailed expert analysis of this issue. She explains that, in the presence of such red flags, Carroll would have been expected under art industry custom to take some combination of the following steps: (1) inquire directly of Salander and insist upon a clear answer or documentation regarding its ownership or rights of sale; (2) consult with the authors and preparers of the forthcoming, definitive Stuart Davis Catalogue Raisonné; (3) consult with Earl Davis "as Stuart Davis scholar and publicly identified owner of many of the works"; (4) review the publications cited in the cataloguing materials *before* agreeing to purchase works in the 2006 Exchanges, instead of reviewing them *after* striking a deal; and (5) examine SOG's list of retail prices for these works to more accurately ascertain whether the prices were so low as to provide cause for concern. In sum, Force opines as follows:

> Carroll failed to carry out the reasonable and necessary diligence that would be expected of an experienced art dealer under the circumstances to assure himself that the proposed transactions were proper and authorized . . . [had] he carried out such proper diligence, he would have discovered that they were unauthorized and he should have abandoned entering into the Transactions.

Although Rosenberg's testimony creates a genuine issue of material fact regarding Force's opinion that Carroll should have consulted with Davis, Force's expert opinion otherwise stands unrefuted. Force is thus the only expert in this case who has offered detailed testimony on the norms of due diligence in the art industry when a sale is clouded by signs of foul play. Because

74

Carroll did not undertake any of the forms of heightened inquiry that Force describes as normal and customary in the industry, any reasonable juror would conclude that Carroll did not meet the duty of heightened inquiry imposed upon him under New York law by virtue of the numerous red flags that he knew, or should have known, about during the 2006 Exchanges.

### 4. Davis Did Not Ratify Carroll's Purchase of the Eight Disputed Works

Carroll argues that Davis's claims are precluded by an affirmative defense of ratification. Even as tested by a summary judgment standard of review, this argument does not sU.C.C.eed. *See Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 113 (S.D.N.Y. 2012) ("Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." (quotation marks and citation omitted)).

Carroll argues that Davis did not object to or repudiate the sale of the Eight Disputed Works to Carroll after he learned of the 2006 Exchanges, thereby ratifying the deal through acquiescence. It is black letter law, however, that ratification requires (1) acceptance by the principal of the benefits of his agent's acts; (2) with full knowledge of the material facts; and (3) circumstances indicating an intention to affirm or adopt the otherwise-unauthorized arrangement. *See Monarch*, 835 F.2d at 36; *Orix*, 1993 WL 183766, at *4. Carroll provides no support for at least two of these elements.

First, even read in the light most favorable to Carroll, the record offers absolutely no support to a finding that Davis accepted any "benefits" of the 2006 Exchanges. To the contrary, he never received payment or any other benefit from SOG for the sale of the Eight Disputed Works.

Second, the record undercuts any claim that Davis had "full knowledge of the material facts" during any of his interactions with Carroll in 2006 and 2007.  Carroll admits that Salander informed Davis that Carroll had the Eight Disputed Works on consignment.  This admission indicates that Davis lacked full knowledge of the material facts.  Further, notwithstanding Carroll's assertion to the contrary, the record shows that Davis e-mailed Carroll and specifically challenged Carroll's claimed ownership of the Eight Disputed Works by indicating his belief that Carroll possessed the works on consignment.  Carroll ignored this inquiry, prompting Davis to follow-up in an e-mail about the Catalogue Raisonné with a request for "as much information on these works as you can provide."  Carroll makes no claim that he disclosed the 2006 Transaction to Davis and makes no claim that Davis actually knew of the transactions.[27]

In sum, no reasonable juror could conclude that Davis ratified the 2006 Exchanges.

### 5.   Conclusion:  Summary Judgment is Warranted

Carroll consummated the 2006 Exchanges in the shadow of glaring and unmistakable signs of foul play.  His conduct during those transactions evinced a subjective awareness of irregular dealings.  In any event, under the objective standard set forth by New York law, a purchaser in Carroll's position *should* have been alerted to serious irregularities by the numerous red flags that riddled Carroll's course of dealing with SOG in early 2006.  As a result, Carroll was actually or constructively on notice of the need for "further verification" before he signed the Summary Exchange Agreements in 2006.  *Porter* 416 N.Y.S.2d at 258.  Yet he took virtually none of the steps customary in the art market to confirm the deal's legitimacy.

---

[27] These e-mails also suggest that Carroll could not satisfy the third element of a ratification defense, since Davis responded by challenging the deal, not by indicating his intent to accept it.

Any reasonable juror would conclude that, at best, Carroll displayed the very "commercial indifference" condemned by the U.C.C. and *Porter*. At worst, Carroll knowingly took advantage of SOG's sordid dealings to achieve exorbitant profit and then sought to shield himself behind the unwarranted title of "buyer in ordinary course." In the market for art, New York law does not tolerate such persistent indifference to questionable dealings. Intentional or reckless blindness to signs of foul play creates a fertile ground for fraud, facilitates a vast market in stolen works, and runs afoul of both industry norms and legal obligations.

Accordingly, the motion for summary judgment is granted.

## IV.   Conclusion

For the foregoing reasons, Davis's motion to strike is GRANTED IN PART and DENIED IN PART, Davis's motion for sanctions is DENIED, and Davis's motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motions at Dkt. Nos. 69, 71, & 74.

The parties are directed either to submit to the Court by April 19, 2013 a joint proposed order providing Davis with appropriate relief or, if they are unable to reach agreement on the text of such a proposed order, to each submit a proposed order along with a letter of no more than three pages setting forth their positions.

SO ORDERED.


Dated: New York, New York
       March 29, 2013

_____
J. PAUL OETKEN
United States District Judge

77